# SCHIRO *v.* FARLEY, SUPERINTENDENT, INDIANA STATE PRISON, ET AL.

No. 92–7549.   Argued November 1, 1993—Decided January 19, 1994

O'CONNOR, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and SCALIA, KENNEDY, SOUTER, THOMAS, and GINSBURG, JJ., joined. BLACKMUN, J., filed a dissenting opinion, *post*, p. 237. STEVENS, J., filed a dissenting opinion, in which BLACKMUN, J., joined, *post*, p. 239.

*Monica Foster*, by appointment of the Court, 508 U. S. 970, argued the cause for petitioner. With her on the briefs was *Rhonda Long-Sharp*.

*Arend J. Abel*, Deputy Attorney General of Indiana, argued the cause for respondents. With him on the brief were *Pamela Carter*, Attorney General, and *Matthew R. Gutwein* and *Wayne E. Uhl*, Deputy Attorneys General.

JUSTICE O'CONNOR delivered the opinion of the Court.

In this case we determine whether the Double Jeopardy Clause requires us to vacate the sentence of death imposed

on petitioner Thomas Schiro. For the reasons explained below, we hold that it does not.

## I

Schiro was convicted and sentenced to death for murder. The body of Laura Luebbehusen was discovered in her home on the morning of February 5, 1981, by her roommate, Darlene Hooper, and Darlene Hooper's former husband. Darlene Hooper, who had been away, returned to find the home in disarray. Blood covered the walls and floor; Laura Luebbehusen's semiclad body was lying near the entrance. The police recovered from the scene a broken vodka bottle, a handle and metal portions of an iron, and bottles of various types of liquor.

The pathologist testified that there were a number of contusions on the body, including injuries to the head. The victim also had lacerations on one nipple and a thigh, and a tear in the vagina, all caused after death. A forensic dentist determined that the thigh injury was caused by a human bite. The cause of death was strangulation.

Laura Luebbehusen's car was later found near a halfway house where Schiro was living. Schiro told one counselor at the halfway house he wanted to discuss something "heavy." App. 53. Schiro later confessed to another counselor that he had committed the murder. After his arrest, he confessed to an inmate in the county jail that he had been drinking and taking Quaaludes the night of the killing, and that he had had intercourse with the victim both before and after killing her.

Schiro also admitted the killing to his girlfriend, Mary Lee. Schiro told Mary Lee that he gained access to Laura Luebbehusen's house by telling her his car had broken down. Once in the house, he exposed himself to her. She told him that she was a lesbian, that she had been raped as a child, that she had never otherwise had intercourse before and did not want to have sex. Nonetheless, Schiro raped her numerous times. There was evidence that Schiro forced her

to consume drugs and alcohol. When Laura Luebbehusen tried to escape, Schiro restrained and raped her at least once more. Then, as Laura Luebbehusen lay or slept on the bed, Schiro realized that she would have to die so that she would not turn him in. He found the vodka bottle and beat her on the head with it until it broke. He then beat her with the iron and, when she resisted, finally strangled her to death. Schiro dragged her body into another room and sexually assaulted the corpse. After the murder, he attempted to destroy evidence linking him to the crime.

## II

At the time of the crime, the State of Indiana defined murder as follows:

"A person who:
"(1) knowingly or intentionally kills another human being; or
"(2) kills another human being while committing or attempting to commit arson, burglary, child molesting, criminal deviate conduct, kidnapping, rape or robbery;
"commits murder, a felony." Ind. Code § 35–42–1–1 (Supp. 1978).

Schiro was charged with three counts of murder. In Count I he was charged with "knowingly" killing Laura Luebbehusen; in Count II with killing her while committing the crime of rape; and in Count III with killing her while committing criminal deviate conduct. App. 3–5. The State sought the death penalty for Counts II and III.

At trial, Schiro did not contest that he had killed Laura Luebbehusen. Indeed, in closing argument, Schiro's defense attorney stated: "Was there a killing? Sure, no doubt about it. Did Tom Schiro do it? Sure . . . . There's no question about it, I'm not going to try . . . and 'bamboozle' this jury. There was a killing and he did it." App. to Brief for Respondent 24. Instead, the defense argued that Schiro

either was not guilty by reason of insanity or was guilty but mentally ill, an alternative verdict permitted under Indiana law.

The jury was given 10 possible verdicts, among them the 3 murder counts described above, the lesser included offenses of voluntary and involuntary manslaughter, guilty but mentally ill, not guilty by reason of insanity, and not guilty. App. 37–38. After five hours of deliberation, the jury returned a verdict of guilty on Count II; it left the remaining verdict sheets blank.

Under Indiana law, to obtain the death penalty the State is required to establish beyond a reasonable doubt the existence of at least one of nine aggravating factors. Ind. Code' § 35–50–2–9(b) (Supp. 1978). The aggravating factor relevant here is: "[T]he defendant committed the murder by intentionally killing the victim while committing or attempting to commit . . . rape" or another enumerated felony. § 35–50–2–9(b)(1). Upon proof beyond a reasonable doubt of an aggravating factor, the sentencer weighs the factor against any mitigating circumstances. When the initial conviction is by a jury, the "jury . . . reconvene[s] for the sentencing hearing" to "recommend to the court whether the death penalty should be imposed." §§ 35–50–2–9(d), (e). The trial judge makes "the final determination of the sentence, after considering the jury's recommendation." § 35–50–2–9(e)(2). "The court is not bound by the jury's recommendation," however. *Ibid.*

The primary issue at the sentencing hearing was the weight to be given Schiro's mitigating evidence. Defense counsel stated to the jury that "I assume by your verdict [at the guilt phase that] you've probably decided" that the aggravating circumstance was proved. App. to Brief for Respondent 31–32. He therefore confined his argument to a plea for leniency, citing Schiro's mental and emotional problems. After considering the statements of counsel, the jury recommended against the death penalty. The trial judge

rejected the jury's recommendation and sentenced Schiro to death. While the case was pending on direct appeal, the Indiana Supreme Court granted the State's petition to remand the case to the trial court to make written findings of fact regarding aggravating and mitigating circumstances. The trial court found that the State had proved beyond a reasonable doubt that "[t]he defendant committed the murder by intentionally killing the victim while committing or attempting to commit . . . rape." App. 46. The trial court also found that no mitigating circumstances had been established, and reaffirmed the sentence of death. *Id.*, at 50.

The sentence was affirmed on direct appeal to the Indiana Supreme Court. *Schiro* v. *State*, 451 N. E. 2d 1047 (1983). This Court denied certiorari. *Schiro* v. *Indiana*, 464 U. S. 1003 (1983). Schiro sought postconviction relief in state court. Again, the Indiana Supreme Court affirmed the judgment of the trial court. *Schiro* v. *State*, 479 N. E. 2d 556 (1985). This Court again denied a petition for a writ of certiorari. *Schiro* v. *Indiana*, 475 U. S. 1036 (1986). Schiro then filed a petition for a writ of habeas corpus in the United States District Court for the Northern District of Indiana. The District Judge remanded the case to the Indiana courts for exhaustion of state remedies. The Indiana Supreme Court affirmed the conviction and sentence for a third time. *Schiro* v. *State*, 533 N. E. 2d 1201 (1989). In so doing, the Indiana Supreme Court rejected Schiro's argument that the jury's failure to convict him on the first murder count operated as an acquittal of intentional murder, and that the Double Jeopardy Clause prohibited the use of the intentional murder aggravating circumstance for sentencing purposes. The Indiana Supreme Court held that "[felony murder] is not an included offense of [murder] and where the jury, as in the instant case, finds the defendant guilty of one of the types of murder and remains silent on the other, it does not operate as an acquittal of the elements of the type of murder the jury

chose not to consider." *Id.*, at 1208. This Court denied certiorari. *Schiro* v. *Indiana,* 493 U. S. 910 (1989).

The Federal District Court then denied Schiro's federal habeas petition. *Schiro* v. *Clark,* 754 F. Supp. 646 (ND Ind. 1990). The Court of Appeals for the Seventh Circuit affirmed. *Schiro* v. *Clark,* 963 F. 2d 962 (1992). The Court of Appeals accepted the Indiana Supreme Court's conclusion that the jury's verdict was not an acquittal on the Count I murder charge, and that the Double Jeopardy Clause was not violated by the use of the intentional murder aggravating circumstance. The Court of Appeals also concluded that collateral estoppel was not implicated since "the defendant must show that the jury's verdict actually and necessarily determined the issue he seeks to foreclose" and "Schiro's conviction for murder/rape did not act as an acquittal with respect to the pure murder charge as a matter of state law." *Id.*, at 970, n. 7.

We granted certiorari, 508 U. S. 905 (1993), to consider whether the trial court violated the Double Jeopardy Clause by relying on the intentional murder aggravating circumstance.

## III

The State argues that granting relief to Schiro would require the retroactive application of a new rule, in violation of the principle announced in *Teague* v. *Lane,* 489 U. S. 288 (1989) (plurality opinion). *Teague* analysis is ordinarily our first step when we review a federal habeas case. See, *e. g., Graham* v. *Collins,* 506 U. S. 461, 466–467 (1993). The *Teague* bar to the retroactive application of new rules is not, however, jurisdictional. *Collins* v. *Youngblood,* 497 U. S. 37, 40–41 (1990). In this case, the State did not raise the *Teague* argument in the lower courts. Cf. *Parke* v. *Raley,* 506 U. S. 20, 26 (1993). While we ordinarily do not review claims made for the first time in this Court, see, *e. g., Taylor* v. *Freeland & Kronz,* 503 U. S. 638, 645–646 (1992), we recognize that the State, as respondent, is entitled to rely on any

legal argument in support of the judgment below. See, *e. g.,* *Dandridge* v. *Williams,* 397 U. S. 471, 475, n. 6 (1970).

Nevertheless, the State failed to argue *Teague* in its brief in opposition to the petition for a writ of certiorari. In deciding whether to grant certiorari in a particular case, we rely heavily on the submissions of the parties at the petition stage. See this Court's Rule 15.1. If, as in this case, a legal issue appears to warrant review, we grant certiorari in the expectation of being able to decide that issue. Since a State can waive the *Teague* bar by not raising it, see *Godinez* v. *Moran,* 509 U. S. 389, 397, n. 8 (1993), and since the propriety of reaching the merits of a dispute is an important consideration in deciding whether or not to grant certiorari, the State's omission of any *Teague* defense at the petition stage is significant. Although we undoubtedly have the discretion to reach the State's *Teague* argument, we will not do so in these circumstances.

## IV

Schiro first argues that he could not be sentenced to death based on the intentional murder aggravating circumstance, because the sentencing proceeding amounted to a successive prosecution for intentional murder in violation of the Double Jeopardy Clause.

We have recognized that the Double Jeopardy Clause consists of several protections: "It protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense." *North Carolina* v. *Pearce,* 395 U. S. 711, 717 (1969) (footnotes omitted). These protections stem from the underlying premise that a defendant should not be twice tried or punished for the same offense. *United States* v. *Wilson,* 420 U. S. 332, 339 (1975). The Clause operates as a "bar against repeated attempts to convict, with consequent subjection of the defendant to embarrassment, expense, anxiety, and insecurity, and the possibility that he may be found

guilty even though innocent." *United States* v. *DiFrancesco*, 449 U. S. 117, 136 (1980). When a defendant has been acquitted, the "Clause guarantees that the State shall not be permitted to make repeated attempts to convict him." *Wilson, supra,* at 343. Where, however, there is "no threat of either multiple punishment or successive prosecutions, the Double Jeopardy Clause is not offended." 420 U. S., at 344 (footnote omitted). Thus, our cases establish that the primary evil to be guarded against is successive prosecutions: "[T]he prohibition against multiple trials is the controlling constitutional principle." *DiFrancesco, supra,* at 132 (internal citations omitted). See also *United States* v. *Martin Linen Supply Co.,* 430 U. S. 564, 569 (1977).

Schiro urges us to treat the sentencing phase of a single prosecution as a successive prosecution for purposes of the Double Jeopardy Clause. We decline to do so. Our prior decisions are inconsistent with the argument that a first sentencing proceeding can amount to a successive prosecution. In *Stroud* v. *United States,* 251 U. S. 15, 17–18 (1919), we held that where a defendant's murder conviction was overturned on appeal, the defendant could be resentenced after retrial. Similarly, we found no constitutional infirmity in holding a second sentencing hearing where the first sentence was improperly based on a prior conviction for which the defendant had been pardoned. *Lockhart* v. *Nelson,* 488 U. S. 33 (1988). See also *North Carolina* v. *Pearce, supra,* at 721 ("[W]e cannot say that the constitutional guarantee against double jeopardy of its own weight restricts the imposition of an otherwise lawful single punishment" upon retrial); *Chaffin* v. *Stynchcombe,* 412 U. S. 17, 23–24 (1973) (same). If a second sentencing proceeding ordinarily does not violate the Double Jeopardy Clause, we fail to see how an initial sentencing proceeding could do so.

We have also upheld the use of prior convictions to enhance sentences for subsequent convictions, even though this means a defendant must, in a certain sense, relitigate in a

sentencing proceeding conduct for which he was previously tried. *Spencer* v. *Texas*, 385 U. S. 554, 560 (1967). Cf. *Moore* v. *Missouri*, 159 U. S. 673, 678 (1895) ("[T]he State may undoubtedly provide that persons who have been before convicted of a crime may suffer severer punishment for subsequent offences than for a first offence"). In short, as applied to successive prosecutions, the Clause "is written in terms of potential or risk of trial and conviction, not punishment." *Price* v. *Georgia*, 398 U. S. 323, 329 (1970).

Our decision in *Bullington* v. *Missouri*, 451 U. S. 430 (1981), is not to the contrary. Bullington was convicted of capital murder. At the first death penalty sentencing proceeding, the jury rejected the death penalty and sentenced him to a term of years. The conviction was overturned; on resentencing the State again sought the death penalty. In *Bullington* we recognized the general rule that "the Double Jeopardy Clause imposes no absolute prohibition against the imposition of a harsher sentence at retrial." *Id.*, at 438. Nonetheless, we recognized a narrow exception to this general principle because the capital sentencing scheme at issue "differ[ed] significantly from those employed in any of the Court's cases where the Double Jeopardy Clause has been held inapplicable to sentencing." *Ibid.* Because the capital sentencing proceeding "was itself a trial on the issue of punishment," *ibid.*, requiring a defendant to submit to a second, identical proceeding was tantamount to permitting a second prosecution of an acquitted defendant, *id.*, at 446.

This case is manifestly different. Neither the prohibition against a successive trial on the issue of guilt nor the *Bullington* prohibition against a second capital sentencing proceeding is implicated here—the State did not reprosecute Schiro for intentional murder, nor did it force him to submit to a second death penalty hearing. It simply conducted a single sentencing hearing in the course of a single prosecution. The state is entitled to "one fair opportunity" to prosecute a defendant, *Bullington, supra,* at 446 (internal quota-

tion marks omitted), and that opportunity extends not only to prosecution at the guilt phase, but also to present evidence at an ensuing sentencing proceeding.

## V

Schiro also contends that principles of constitutional collateral estoppel require vacation of his death sentence. In *Ashe* v. *Swenson*, 397 U. S. 436 (1970), we held that the Double Jeopardy Clause incorporates the doctrine of collateral estoppel in criminal proceedings. See also *Dowling* v. *United States*, 493 U. S. 342, 347 (1990). Collateral estoppel, or, in modern usage, issue preclusion, "means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." *Ashe*, 397 U. S., at 443. Schiro reasons that the jury acquitted him of "intentionally" murdering Laura Luebbehusen, and that as a result, the trial court was precluded from finding the existence of the aggravating circumstance that he "committed the murder by intentionally killing the victim while committing or attempting to commit . . . rape." We do not address whether collateral estoppel could bar the use of the "intentional" murder aggravating circumstance, because Schiro has not met his burden of establishing the factual predicate for the application of the doctrine, if it were applicable, namely, that an "issue of ultimate fact has once been determined" in his favor. *Ibid.*

The Indiana Supreme Court concluded that the jury verdict did not amount to an acquittal on the intentional murder count. *Schiro* v. *State*, 533 N. E. 2d, at 1201. Ordinarily on habeas review, we presume the correctness of state court findings of fact. See 28 U. S. C. § 2254(d). Cf. also *Cichos* v. *Indiana*, 385 U. S. 76, 79–80 (1966). The preclusive effect of the jury's verdict, however, is a question of federal law which we must review *de novo*. Cf. *Ashe* v. *Swenson*, 397 U. S., at 444.

We must first determine "whether a rational jury could have grounded its verdict upon an issue other than" Schiro's intent to kill. *Ibid.* Cf. 18 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 4421, p. 192 (1981) ("Issue preclusion attaches only to determinations that were necessary to support the judgment entered in the first action"). To do so, we "examine the record of a prior proceeding taking into account the pleadings, evidence, charge, and other relevant matter . . . ." *Ashe* v. *Swenson, supra,* at 444 (internal quotation marks omitted). The burden is "on the defendant to demonstrate that the issue whose relitigation he seeks to foreclose was actually decided in the first proceeding." *Dowling,* 493 U. S., at 350. In *Dowling,* for example, the defendant contended that because he had been acquitted of a robbery, the jury must have concluded that he had not been present at the crime. *Ibid.* In rejecting that argument, we considered the fact that during the trial there was a discussion between the lawyers and the judge where it was asserted that the intruder's identity was not a factual issue in the case. *Id.,* at 351. Because there were "any number of possible explanations for the jury's acquittal verdict," the defendant had "failed to satisfy his burden of demonstrating" that he was not one of the intruders. *Id.,* at 352.

Applying these principles, we find that the jury could have grounded its verdict on an issue other than Schiro's intent to kill. The jury was not instructed to return verdicts on all the counts listed on the verdict sheets. In fact, there are indications in the record that the jury might have believed it could only return one verdict. In closing argument at the guilt phase, defense counsel told the jury that it would "have to go back there and try to figure out which one of eight or ten verdicts . . . that you will return back into this Court." App. to Brief for Respondents 17. The prosecution also told the jury that "you are only going to be allowed to return one verdict." *Id.,* at 27. Although the jury instructions indi-

cated to the jury that more than one verdict was possible, *id.*, at 27–28, on this record it is impossible to tell which of these statements the jury relied on. The dissent concludes that the jury acquitted on Count I for lack of intent, based on the fact that the only way the jury could have expressed that conclusion was by leaving the Count I verdict form blank, as it did. What stands in the way of such an inference, however, is that the jury would also have acted as it did after reaching a guilty verdict on Count II but without ever deliberating on Count I. In short, since it was not clear to the jury that it needed to consider each count independently, we will not draw any particular conclusion from its failure to return a verdict on Count I.

The jury instructions on the issue of intent to kill were also ambiguous. Under Indiana law, a person who either "knowingly or intentionally kills another human being" or "kills another human being while committing or attempting to commit . . . rape" is guilty of "murder." Ind. Code § 35–42–1–1 (Supp. 1978). Thus, intent to kill is not required for a felony murder conviction. Schiro reasons that since the jury found him guilty of felony murder in the course of a rape, but failed to convict him of intentional murder, the jury must have found that he did not have an intent to kill.

We do not so interpret the jury's failure to convict on Count I, however. Although the jury was provided with the state law definition of murder, App. 21, the judge also instructed the jury that the State had to prove intent for both felony and intentional murder: "To sustain the charge of *murder*, the State must prove . . . [t]hat the defendant engaged in the conduct which caused the death of Laura Luebbehusen [and] [t]hat when the defendant did so, he knew the conduct would or intended the conduct to cause the death of Laura Luebbehusen." *Id.*, at 22–23 (emphasis added). This instruction did not differentiate between the two ways of proving "murder" under Indiana law. The jury was fur-

ther told that "[t]he instructions of the court are the best source as to the law applicable to this case." *Id.*, at 20. The jury may well have believed, therefore, that it was required to find a knowing or intentional killing in order to convict Schiro on any of the three murder counts. In sum, in light of the jury instructions, we find that as a matter of law the jury verdict did not necessarily depend on a finding that Schiro lacked an intent to kill.

Although not necessary to our conclusion, we note that there is additional evidence in the record indicating that Schiro's intent to kill was not a significant issue in the case. The defense primarily confined its proof at trial to showing that Schiro was insane, and did not dispute that Schiro had committed the murder. At no point during the guilt phase did defense counsel or any of the defense witnesses assert that Schiro should be acquitted on Count I because he lacked an intent to kill. Indeed, we have located no point in the transcript of the proceedings where defense counsel or defense witnesses even discussed the issue of Schiro's intent to kill. Schiro argues that his intent to kill was put in issue by the insanity defense. But, even if that were so, the jury did not accept this defense. Even defense counsel apparently believed that Schiro's intent was not an issue in the case. After the jury returned its verdict of guilty on Count II, and reconvened to consider the appropriate sentence, defense counsel indicated his belief that by convicting Schiro on Count II, the jury had found that he had an intent to kill:

> "The statute . . . provides for aggravating circumstances. There is one listed in this case, and one which you may consider. And that one is that the murder was committed, was intentionally committed in the commission of rape and some other things. I assume by your verdict Friday, or Saturday, that you've probably . . . decided that issue. In finding him guilty of murder in the commission of rape, I'm assuming you've decided beyond

a reasonable doubt that it was done in the commission of a rape, and so that aggravating circumstance most likely exists in your mind." App. to Brief for Respondent 31–32.

Finally, we observe that a jury finding of intent to kill is entirely consistent with the evidence presented at trial. By Schiro's own admission, he decided to kill Laura Luebbehusen after she tried to escape and he realized she would go to the police. In addition, the physical evidence suggested a deliberate, rather than unintentional, accidental, or even reckless, killing. The victim was repeatedly beaten with a bottle and an iron; when she resisted, she was strangled to death.

We have in some circumstances considered jury silence as tantamount to an acquittal for double jeopardy purposes. *Green* v. *United States*, 355 U. S. 184, 190–191 (1957); *Price* v. *Georgia*, 398 U. S., at 329. The failure to return a verdict does not have collateral estoppel effect, however, unless the record establishes that the issue was actually and necessarily decided in the defendant's favor. As explained above, our cases require an examination of the entire record to determine whether the jury could have "grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration." *Ashe*, 397 U. S., at 444 (internal quotation marks omitted). See also *Dowling*, 493 U. S., at 350. In view of Schiro's confession to the killing, the instruction requiring the jury to find intent to kill, and the uncertainty as to whether the jury believed it could return more than one verdict, we find that Schiro has not met his "burden . . . to demonstrate that the issue whose relitigation he seeks to foreclose was actually decided" in his favor. *Ibid.*

The judgment of the Court of Appeals is affirmed.

*So ordered.*

JUSTICE BLACKMUN, dissenting.

I join JUSTICE STEVENS' dissenting opinion. I write separately because I believe *Bullington* v. *Missouri*, 451 U. S. 430 (1981), provides a compelling alternative ground for vacation of Schiro's death sentence.

In *Bullington*, this Court held that once a capital defendant is acquitted of the death sentence, the Double Jeopardy Clause bars his again being placed in jeopardy of death at a subsequent sentencing proceeding. The majority rejects Schiro's double jeopardy claim on the theory that because "a second sentencing proceeding ordinarily does not violate the Double Jeopardy Clause," it fails to see "how an initial sentencing proceeding could do so." *Ante*, at 230. The essential holding of *Bullington*, however, was that capital sentencing proceedings uniquely *can* constitute a "jeopardy" under the Double Jeopardy Clause. The proceeding examined in *Bullington* had "the hallmarks of the trial on guilt or innocence," 451 U. S., at 439, where the prosecution must "prov[e] its case" beyond a reasonable doubt, *id.*, at 443. We concluded that such a bifurcated capital penalty proceeding is itself a trial that places a defendant in jeopardy of death. *Ibid.*

The sentencing proceeding at issue here is indistinguishable from that confronted in *Bullington*. As Justice De-Bruler noted in dissent from the affirmance of Schiro's sentence on direct appeal:

> "[T]he jury reconvenes in court for the sentencing hearing. It is presided over by the judge. The defendant is present with his counsel and the state by its trial prosecutor. Evidence is presented in an adversarial setting .... The burden is upon the state to prove the aggravating circumstance beyond a reasonable doubt. The lawyers make final arguments to the jury. The jury retires to deliberate and returns into open court with its verdict in the form of a recommendation. This is a full scale jury trial in every sense of those terms. The defendant must surely feel that he is in 'direct peril'

of receiving the death penalty as he stands to receive the recommendation of the jury." *Schiro* v. *State,* 451 N. E. 2d 1047, 1065 (Ind. 1983) (citation omitted).

The "unique" nature of modern capital sentencing proceedings identified in *Bullington,* 451 U. S., at 442, n. 15, derives from the fundamental principle that death is "different," see, *e. g., Gardner* v. *Florida,* 430 U. S. 349, 357 (1977) (plurality opinion); *Woodson* v. *North Carolina,* 428 U. S. 280, 305 (1976) (plurality opinion); see also *Furman* v. *Georgia,* 408 U. S. 238, 306 (1972) (Stewart, J., concurring), and that heightened reliability is required at all stages of the capital trial. The "trial-like" nature of Schiro's capital sentencing proceeding, and the trauma he necessarily underwent in defending against the sentence of death, are directly analogous to guilt-phase proceedings and thus bring the Double Jeopardy Clause into play.

Even if the issue of Schiro's intent to kill was not "actually and necessarily decided" for collateral estoppel purposes, *ante,* at 236, the jury's failure to convict Schiro of intentional murder impliedly acquitted him under the Double Jeopardy Clause. See *Green* v. *United States,* 355 U. S. 184, 191 (1957) (jury "was given a full opportunity to return a verdict"); *Price* v. *Georgia,* 398 U. S. 323, 329 (1970). As JUSTICE STEVENS pointedly notes, *post,* at 243, there is no question that Schiro could not have been reprosecuted for intentional murder. Nor is there any question that the aggravator required the prosecution to prove again at sentencing, beyond a reasonable doubt, the identical elements of that murder charge. Thus, "the jury ha[d] already acquitted the defendant of whatever was necessary to impose the death sentence." 451 U. S., at 445. Over a unanimous jury recommendation of life and after a State Supreme Court remand, the trial judge condemned Schiro to death in reliance *nunc pro tunc* on the very conduct for which Schiro had been acquitted. This sentence cannot be tolerated under the Double Jeopardy Clause.

I respectfully dissent.

JUSTICE STEVENS, with whom JUSTICE BLACKMUN joins, dissenting.

The jury found Thomas Schiro guilty of felony murder but not intentional murder. Thereafter, in a separate sentencing hearing, the same jury unanimously concluded that Schiro did not deserve the death penalty, presumably because he had not intended to kill.[1] Nevertheless, without finding any aggravating circumstance, the trial judge overrode the jury's recommendation and sentenced Schiro to death. Months later, when the Indiana Supreme Court remanded the case to give the judge an opportunity to justify that sentence, the judge found that Schiro had intentionally killed his victim. That finding, like the majority's holding today, violated the central purpose of the Double Jeopardy Clause. After the issue of intent had been raised at trial and twice resolved by the jury, and long after that jury had been discharged, it was constitutionally impermissible for the trial judge to reexamine the issue. Because the death sentence rests entirely on that unauthorized finding, the law requires that it be set aside.

I

The Court devotes most of its opinion to a discussion of the facts. I cannot disagree that the gruesome character of the crime is significant. It is important precisely because it is so favorable to prosecutors seeking the death penalty.

---

[1] Under Indiana's death penalty statute, the State may seek the death penalty for murder by proving beyond a reasonable doubt the existence of at least one statutory aggravating circumstance. Ind. Code § 35–50–2–9(a) (Supp. 1978). The only aggravating circumstance at issue here was whether the defendant committed the murder by intentionally killing the victim while committing or attempting to commit rape or one of six other enumerated felonies. § 35–50–2–9(b)(1). When trial is by jury, the jury that convicted the defendant may recommend the death penalty only if it finds that the state proved beyond a reasonable doubt that at least one aggravating circumstance exists and that the aggravating circumstances outweigh any mitigating circumstances. § 35–50–2–9(e).

Such facts undoubtedly would increase jurors' inclination to impose the death penalty if they believed the defendant had intentionally killed his unfortunate victim. Yet in this case, despite the horror of the crime, the jurors *still* unanimously refused to find Schiro guilty of intentional murder and unanimously concluded that he should not be executed. These determinations are enigmatic unless the jury resolved the intent issue in Schiro's favor.

The principal issue at trial was Schiro's mental condition. No one disputed that he had caused his victim's death, but intent remained at issue in other ways. Five expert witnesses—two employed by the State, one selected by the court, and two called by the defense—testified at length about Schiro's unusual personality, *e. g.,* Tr. 1699, his drug and alcohol addiction, *id.,* at 1859, 1877, and his history of mental illness, *e. g., id.,* at 1412, 1414, 1703–1708, 1871, 1877. Lay and expert witnesses described Schiro's bizarre attachment to a mannequin, *id.,* at 1469–1470, 1699–1702, and other incidents that lent support to a claim of diminished capacity. Conceivably, that evidence might have persuaded the jury to find Schiro not responsible by reason of insanity, App. 37, or guilty of murder, voluntary manslaughter, or involuntary manslaughter but mentally ill, *id.,* at 37–38. Instead, that evidence and the details of Schiro's confessions apparently convinced the jury that at the time of his offense, Schiro did not have the requisite mental state to support a conviction for intentional murder.

A careful perusal of the verdict forms demonstrates that there is nothing even arguably ambiguous about the jury's verdict and that the jurors expressed their conclusion in the only way they could. Each of the 10 forms contained a space to be checked to record agreement with a proposed verdict. The only way to record disagreement was to leave the space blank. Thus, by leaving nine forms blank and checking only one, the jurors rejected seven alternatives that were favorable to the defendant (two involving lesser offenses, one

finding the defendant not responsible by reason of insanity, three finding him guilty of murder or lesser offenses but mentally ill, and one finding him not guilty of anything), rejected two alternatives favorable to the prosecution (guilty on Counts I and III), and ultimately recorded their conclusion that he was guilty on Count II.[2] The jurors therefore found Schiro guilty on Count II and not guilty on the remainder of the charges. Notably, only the fourth verdict form provided for a not guilty verdict, and that form could not be executed unless the defendant was not guilty of all charges. The only way the jurors could return a verdict of guilty on Count II and not guilty on the other counts was to check the fifth form and leave the others blank—which is exactly what they did.

Even if the record were less clear, the governing rule of law would lead to the same conclusion. After a full trial, the jury was given the opportunity to find Schiro guilty on each of three counts of murder, on just two of those counts, or on just one. As in the similar situation in *Green* v. *United States*, 355 U. S. 184 (1957), the jury's silence on two counts

---

[2] Each form began: "We, the jury, find the defendant . . . ." The 10 alternatives were:

(1) ". . . not responsible by reason of insanity at the time of the death . . . ."

(2) ". . . guilty of Murder but mentally ill . . . ."

(3) ". . . guilty of the Murder of Laura Luebbehusen as charged in Count I of the information."

(4) ". . . not guilty."

(5) ". . . guilty of Murder while the said Thomas N. Schiro was committing and attempting the crime of rape as charged in Count II of the information."

(6) ". . . guilty while . . . committing and attempting to commit the crime of criminal deviate conduct as charged in Count III of the information."

(7) ". . . guilty of . . . the included offense of Voluntary Manslaughter."

(8) ". . . guilty of . . . the included offense of Involuntary Manslaughter."

(9) ". . . guilty of . . . Voluntary Manslaughter, but mentally ill."

(10) ". . . guilty of . . . Involuntary Manslaughter, but mentally ill." App. 37–38.

should be treated no differently, for double jeopardy purposes, than if the jury had returned a verdict that expressly read: "'We find the defendant not guilty of intentional murder but guilty of murder in the second degree.'" *Id.*, at 191.[3] The only rational explanation for such a verdict is a failure of proof on the issue of intent—a failure that should have precluded relitigation of that issue at sentencing. As Justice DeBruler of the Indiana Supreme Court explained in his dissenting opinion:

> "At the trial, the prosecution used every resource at its disposal to persuade the jury that appellant had a knowing state of mind when he killed his victim. It failed to do so. At the sentencing hearing before the jury it had an opportunity to persuade the jury that appellant had an intentional state of mind when he killed his victim. The jury returned a recommendation of no death. At the sentencing hearing before the judge, the prosecution had yet another opportunity to demonstrate an intentional state of mind, and finally succeeded. In my view, the silent verdict of the jury on Count I, charging a knowing state of mind, must be deemed the constitutional equivalent of a final and immutable rejection of the State's claim that appellant deserves to die because he had an intentional state of mind. That verdict acquitted appellant of that condition which was necessary to impose the death penalty under this charge." *Schiro* v. *State*, 533 N. E. 2d 1201, 1209 (1989).

In this case the trial judge's decision to override the jury's recommendation against the death sentence rested entirely on his finding that Schiro had intentionally killed his vic-

---

[3] "American courts have held with uniformity that where a defendant is charged with two offenses, neither of which is a lesser offense included within the other, and has been found guilty on one but not on the second he cannot be tried again on the second . . . ." 355 U. S., at 194, n. 14. See also *Price* v. *Georgia*, 398 U. S. 323, 328–329 (1970).

tim—an aggravating circumstance that, in Indiana capital sentencing proceedings, must be established beyond a reasonable doubt. Ind. Code §35–50–2–9(e)(1) (Supp. 1978). In other words, the judge sentenced Schiro to death because he was guilty of intentional murder, even though the jury had found otherwise. Even though the Court has held that the Constitution does not preclude a judge from overriding a jury's recommendation of a life sentence, *Spaziano* v. *Florida*, 468 U. S. 447, 490 (1984), an egregious violation of the collateral estoppel principles embedded in the Double Jeopardy Clause occurs if the judge can base a capital sentence on a factual predicate that the jury has rejected.[4] That is what happened here.

## II

Having failed to convict Schiro of intentional murder after a full trial, the State plainly could not retry him for that offense after the jury was discharged. An estoppel that would bar a retrial should equally foreclose a death sentence predicated on a postverdict reexamination of the central issue resolved by the jury against the State. Schiro's execution will nonetheless go forward because the trial judge

---

[4] To be sure, it is generally accepted among the Federal Courts of Appeals that a judge may base a sentence in a noncapital case upon factors that the jury did not find beyond a reasonable doubt. See, *e. g., United States* v. *Carrozza*, 4 F. 3d 70, 80 (CA1 1993); *United States* v. *Olderbak*, 961 F. 2d 756, 764–765 (CA8), cert. denied, 506 U. S. 959 (1992); *United States* v. *Averi*, 922 F. 2d 765, 765–766 (CA11 1991); *United States* v. *Rodriguez-Gonzalez*, 899 F. 2d 177, 180–182 (CA2), cert. denied, 498 U. S. 844 (1990); *United States* v. *Isom*, 886 F. 2d 736, 738–739 (CA4 1989); *United States* v. *Juarez-Ortega*, 866 F. 2d 747, 749 (CA5 1989); see also *McMillan* v. *Pennsylvania*, 477 U. S. 79 (1986) (applying preponderance-of-evidence standard to sentencing considerations under state mandatory minimum statute satisfies due process). This view stems from the lower standard of proof required to establish sentencing factors in noncapital cases. *United States* v. *Mocciola*, 891 F. 2d 13, 16–17 (CA1 1989). But reliance upon this principle cannot sustain such a practice in a capital case where the sentencing factors—just as the elements at trial—must be proved beyond a reasonable doubt.

made a postverdict finding equivalent to a determination that Schiro was guilty of intentional murder. The Court attempts to justify this anomalous result by relying on the improbable assumption that the jury may not have resolved the intent issue in Schiro's favor. The Court advances three reasons in support of that assumption: Schiro's "confession to the killing, the instruction requiring the jury to find intent to kill, and the uncertainty as to whether the jury believed it could return more than one verdict." *Ante*, at 236.[5] None justifies the majority's result.

As to Schiro's confessions, such statements must be evaluated in the context of the entire record. Even though they would have been sufficient to support a guilty verdict on the intentional murder count, it is quite wrong to suggest that they necessitated such a verdict. See *Schiro* v. *State*, 451 N. E. 2d 1047, 1068 (Ind. 1983) (Prentice, J., concurring and dissenting) (stating that a finding of intentional killing "was not compelled"). The record as a whole, including the experts' testimony, is fully consistent with the conclusion that the jury rejected the prosecutor's submission on the intent question.

---

[5] The Court correctly avoids reliance upon the quite different rationale—namely, the distinction between a "knowing" killing and an "intentional" killing—that the Indiana Supreme Court adopted. Noting that Count I merely required the jury to find that Schiro had "knowingly" killed his victim, whereas the aggravating circumstance supporting the death penalty required proof that he had "intentionally" killed, the court concluded that the verdict on Count I "could not be considered to have included any conclusion" on the intent issue raised at the sentencing hearing. *Schiro* v. *State*, 533 N. E. 2d 1201, 1208 (Ind. 1989). Yet because an "intentional" killing requires greater awareness of the consequences of the act than a "knowing" killing, such an illusory distinction is plainly unsatisfactory. As the dissenting justices pointed out, the difference between the two states of mind is insignificant and, in this instance, esoteric: "To accord the difference, one would have to believe that a person can be presently unaware that he is strangling another, while at the same time having a goal presently in mind to strangle such other person." *Id.*, at 1209.

The Court also seeks support from the trial court's Instruction No. 8, which informed the jury that to sustain the charge of murder, the State had to prove intent. *Ante,* at 234.[6] Most naturally read, however, that instruction referred only to the knowing or intentional murder charge in Count I. It did not, as the Court's opinion suggests, expressly refer to "both" felony and intentional murder, *ibid.;* on the contrary, it made no mention of felony murder. In Indiana, intent to kill is not an element of felony murder. Accordingly, the definition of murder in Instruction No. 4 clearly indicated that a person commits murder either when he knowingly or intentionally kills someone *or* when he "[k]ills another human being while committing or attempting to commit arson, burglary, child molesting, criminal deviate conduct, kidnapping, rape or robbery." App. 21; Ind. Code § 35–42–2–1 (Supp. 1978). If Instruction No. 8 were intended to refer to the felony murder charges in Counts II and III, it plainly misstated the law. The instruction *did* accurately state the elements of the knowing or intentional murder charge in Count I, however. It is worth noting that not one of the seven opinions that various members of the Indiana Supreme Court wrote at different stages of this litigation construed that instruction as applicable to Counts II and III.[7]

---

[6] Specifically, Instruction No. 8 provided that "to sustain the charge of murder," the State must prove (1) that "the defendant engaged in the conduct which caused the death of Laura Luebbehusen," and (2) that "when the defendant did so, he knew the conduct would or intended the conduct to cause the death of Laura Luebbehusen." App. 22–23. The instruction further stated that "[i]f you find from your consideration of all the evidence that each of these propositions has been proved beyond a reasonable doubt, and that the defendant was not insane at the time of the murder, then you should find the defendant guilty." *Id.,* at 23.

[7] If, as the Court assumes, the jury believed "that it was required to find a knowing or intentional killing in order to convict Schiro on any of the three murder counts," *ante,* at 235, there is no rational explanation for its failure to return a guilty verdict for intentional murder (Count I) if it

Finally, the Court surmises that the jury "might have believed it could only return one verdict." *Ante*, at 233. In view of the trial court's instruction that the jury foreman "must sign and date the verdict(s) to which you all agree," App. 28, this speculation is unfounded. Similarly unwarranted is the majority's reliance upon isolated remarks by the prosecution and defense counsel to substantiate this speculation. Defense counsel understandably urged the jury to return only one verdict because he was seeking a verdict that would exonerate his client or minimize his culpability. Any one of 7 of the 10 forms submitted to the jury would have served that purpose. In fact, after defense counsel made the amorphous reference to one verdict in his closing argument, he went on to suggest that the jurors consider first the question of insanity, "because depending on that, *you may just stop there* or go on." App. to Brief for Respondents 17 (emphasis added).

As to the prosecutor's comment about "one verdict," *id.*, at 27, if that statement meant that the jury could only return 1 of the 10 forms, it blatantly misstated Indiana law.[8] More plausibly, the comment referred to a verdict in the general sense as the jury's one opportunity to return one or more verdict forms. In any event, we should not uphold a death sentence based on such an insubstantial and improper predicate.

Nothing the Indiana Supreme Court said supports the Court's speculation about the jury's reasons for failing to return a guilty verdict on Count I. Moreover, the Court

---

believed convicting Schiro of killing during the commission of rape (Count II) also required a knowing or intentional killing.

[8] The judge's final instructions to the jury set forth no limitation on the number of verdicts it might properly return, and Indiana juries have regularly found a defendant guilty of both *mens rea* murder and felony murder with respect to a single killing. See, *e. g., Roche* v. *State*, 596 N. E. 2d 896 (Ind. 1992); *Lewis* v. *State*, 595 N. E. 2d 753 (Ind. App. 1992); *Hopkins* v. *State*, 582 N. E. 2d 345 (Ind. 1991).

refuses to acknowledge that the only way the jury could use the verdict forms submitted to it to express the conclusion that Schiro was guilty on Count II and not guilty on Counts I and III was to do just what it did—that is, to authorize the foreman to sign the verdict form for felony murder and to leave blank those forms for intentional murder and criminal deviate conduct.[9] Once found not guilty of intentional murder, Schiro could not thereafter have been prosecuted a second time for that offense. Given that Schiro admitted the killing, the only issue that the jury's verdict on Count I could possibly have resolved in his favor is the intent issue. Since there is not even an arguable basis for assuming that the jury's verdict on Count I was grounded on any other issue, the collateral estoppel component of the Double Jeopardy Clause also precluded the State from attempting to prove intentional murder at the penalty phase to support a sentence of death.

As Justice Stewart explained in his opinion for the Court in *Ashe* v. *Swenson,* 397 U. S. 436, 444 (1970) (footnotes omitted):

> "The federal decisions have made clear that the rule of collateral estoppel in criminal cases is not to be applied with the hypertechnical and archaic approach of a 19th century pleading book, but with realism and ration-

[9] The Court's suggestion that the jury may have reached "a guilty verdict on Count II . . . without ever deliberating on Count I," *ante,* at 234, is not only pure speculation, but highly improbable. Presumably jurors would normally begin their deliberations with the first count in the indictment or the first verdict form the court submitted to them.

It is also noteworthy that the record explains why the jury concluded that Schiro was not guilty of killing while committing or attempting to commit criminal deviate conduct as charged in Count III—namely, that Schiro killed his victim *prior* to the deviate sexual conduct on which the charge was based rather than *while* he was engaged in that predicate felony. Thus the record fully supports the jury's disposition of the three counts at the guilt phase of the trial as well as its decision at the penalty phase.

ality. Where a previous judgment of acquittal was based upon a general verdict, as is usually the case, this approach requires a court to 'examine the record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration.' The inquiry 'must be set in a practical frame and viewed with an eye to all the circumstances of the proceedings.' *Sealfon* v. *United States*, 332 U. S. 575, 579. Any test more technically restrictive would, of course, simply amount to a rejection of the rule of collateral estoppel in criminal proceedings, at least in every case where the first judgment was based upon a general verdict of acquittal."

A fair appraisal of the general verdict of acquittal on Count I compels the conclusion that Schiro's death sentence rests entirely on the trial judge's constitutionally impermissible reexamination of the critical issue resolved in Schiro's favor by the jury's verdict on Count I. The Court's contrary conclusion rests on a "technically restrictive" approach that amounts to a rejection of the rule of collateral estoppel in capital sentencing proceedings.

I respectfully dissent.