UNITED STATES of America,

v.

Qasim DUFFY, Defendant.

No. 02–CR–142(FB).

United States District Court,
E.D. New York.

Feb. 20, 2002.

Alan Vinegrad, United States Attorney, by Leonard Lato, Assistant United States Attorney, Brooklyn, NY, for the Government.

Jason L. Solotaroff, New York City, for the Defendant.

### MEMORANDUM & ORDER

BLOCK, District Judge.

On February 1, 2002, defendant, Qasim Duffy ("Duffy"), was indicted for being a

felon in knowing and intentional possession of ammunition in and affecting commerce, in violation of 18 U.S.C. § 922(g)(1). *See* Indictment, 02–CR–142 (Feb. 1, 2002). Duffy moves to dismiss the indictment, claiming that the Government is collaterally estopped from prosecuting him by reason of his recent acquittal on related charges under a prior indictment. That indictment charged Duffy with Conspiracy to Interfere with Commerce by Robbery, Attempt to Interfere with Commerce by Robbery, and Causing the Death of a Person by Using and Carrying a Firearm. *See* Indictment, 01–CR–102 (Jan. 31, 2001).[1] On January 23, 2002, Duffy was acquitted on each of these counts by a jury in general verdicts.

The circumstances underlying both indictments arose out of an incident that occurred on September 8, 1997, when an individual entered the basement of 141 Hull Street in Brooklyn, New York and attempted to commit a robbery. During the course of the attempted robbery, the assailant shot two victims, killing one.

■ The new indictment superceded a complaint that was issued the day after Duffy's acquittal. *See* Complaint (Jan. 24, 2002); *see also* Fed.R.Crim.P. 5. The complaint, setting forth the same ammunition charge contained in the superceding indictment, stated that the charge arose out of the same robbery and shooting that gave rise to the original charges, and that the ammunition Duffy is charged with possessing are the shell casings that were recovered at the scene of the attempted robbery. *See id.* ("On September 8, 1997, in the basement of 141 Hull Street in Brooklyn, Bilberto Lopez was shot to death ... Crime scene detectives ... did ... recover ... 9–millimeter shell casings.").[2]

For the reasons set forth below, the Court holds that the Government is collaterally estopped from reprosecuting Duffy under the new indictment.

## I

In *Ashe v. Swenson*, the Supreme Court held that the concept of double jeopardy incorporates the doctrine of collateral estoppel. 397 U.S. 436, 443, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970); *see also United States v. Chestaro*, 197 F.3d 600, 608–09 (2d Cir.1999) (recognizing the "collateral estoppel component to the Double Jeopardy Clause" as distinct from traditional double jeopardy analysis) (quoting *United States v. Medina*, 709 F.2d 155, 156 (2d Cir.1983)).[3] Collateral estoppel precludes the Government from relitigating in a second prosecution an issue that "was neces-

---

1. The indictment also charged Duffy with Attempt to Tamper with a Witness; however, this charge was abandoned during the trial.

2. The complaint also charged that Duffy "conspired to use intimidation and threats to induce another person to [withhold evidence]" in violation of 18 U.S.C. § 371. This charge has not been carried over in the superceding indictment. *See* Indictment, 02–CR–142 (Feb. 1, 2002).

3. The defendant concedes that traditional double jeopardy analysis under *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), would not bar this second prosecution. *See* Tr. Oral Argument (Feb. 1, 2002). "Under [the *Blockburger* test], each offense must contain an element not contained in the other; if not, they are the same offense and double jeopardy bars additional punishment and successive prosecution." *United States v. Sessa*, 125 F.3d 68, 71 (2d Cir.1997). The ammunition charge contains an element not contained in any of the original charges, namely, that Duffy was a convicted felon. *See* 18 U.S.C. §§ 922, 924, 1111, 1512, 1951. The charges in the first prosecution contained an element that is not contained in the ammunition charge, namely, the intent to commit robbery. *See id.* Therefore, each offense contains an element that the other does not.

sarily resolved in [the defendant's] favor in the first verdict." *Medina,* 709 F.2d at 156. "The burden is on the defendant to demonstrate that the issue whose relitigation he seeks to foreclose was actually decided in the first proceeding." *Schiro v. Farley,* 510 U.S. 222, 233, 114 S.Ct. 783, 127 L.Ed.2d 47 (1994) (quotation marks omitted).

The Supreme Court has instructed that "the rule of collateral estoppel in criminal cases is not to be applied with the hypertechnical and archaic approach of a 19th century pleading book, but with realism and rationality." *Ashe,* 397 U.S. at 444, 90 S.Ct. 1189; *see also United States v. Citron,* 853 F.2d 1055, 1058 (2d Cir.1988) ("[T]he court should avoid ... straining to postulate hypertechnical and unrealistic grounds on which the jury could conceivably have rested its conclusions." (quotation marks omitted)). Where the initial acquittal was based upon a general verdict "a court must 'examine the record of the prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration.'" *United States v. McGowan,* 58 F.3d 8, 12 (2d Cir.1995) (quoting *Ashe,* 397 U.S. at 444, 90 S.Ct. 1189); *see United States v. Mespoulede,* 597 F.2d 329, 333 (2d Cir.1979). The Second Circuit has "noted that '[s]ince it is usually impossible to determine with any precision upon what basis the jury reached a verdict in a criminal case, it is a rare situation in which the collateral estoppel defense will be available to a defendant.'" *Id.* (quoting *United States v. Tramunti,* 500 F.2d 1334, 1346 (2d Cir.1974)). The present case is one of those rare situations.

## II

Duffy claims that the jury in his first prosecution necessarily determined that there was reasonable doubt as to whether he was the assailant who fired the gun in the basement of 141 Hull Street on September 8, 1997; therefore, the Government is collaterally estopped from rearguing this issue. Duffy further contends that if the Government is barred from arguing that he was the shooter, the Government cannot link him to the ammunition found at the scene of the attempted robbery. The Government makes two arguments in response: (1) that the jury did not necessarily determine there was reasonable doubt that Duffy was the assailant; and (2) that, even if the Government is barred from arguing that Duffy was the assailant, the jury in the second trial could, nevertheless, find him guilty on the ammunition charge. The Court has examined the "record of the prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter" to assess the merits of each of these contentions. *McGowan,* 58 F.3d at 12 (quoting *Ashe,* 397 U.S. at 444, 90 S.Ct. 1189).

The only defense advanced by Duffy at the trial was mistaken identity. In his opening statement, counsel for the defendant explained:

There really is *only one real question in the case* ... To put it a different way or more specifically, the case begins and ends with a young man named Martin Nunez, who is the only eyewitness to this event. Actually, there is another witness, the eyewitness who cannot make an identification.

Tr.[4] at 42 (Jan. 15, 2002) (emphasis added). Consequently, the trial evidence and arguments focused principally on the identification issue. The Government's identifica-

---

**4.** "Tr." refers to the trial transcript.

tion evidence was suspect. There were only two trial witnesses who actually saw the assault, Nunez and the brother of the deceased. At a lineup conducted many months after the shooting, both witnesses failed to identify Duffy. The day after the lineup, police officers investigating the case visited Nunez, a twelve-year-old child at the time of the assault, in his home. During that interview, Nunez recanted and stated that he did recognize Duffy. At trial, Nunez identified Duffy as the shooter, but the decedent's brother did not. Nunez's testimony, however, was riddled with inconsistencies, and the Government conceded that "perhaps [Nunez] was not a reliable eyewitness." Tr. at 391 (Jan. 22, 2002). The evidence at trial established that on the day of the incident Nunez told the police that the attacker was a light-skinned black man with a heavy mustache and a goatee. A photograph taken of Duffy on the day of the attempted robbery depicted Duffy as a clean-shaven dark-skinned black man. As with his opening, defense counsel's closing argument substantively addressed only the identity issue.

## III

In regard to the Government's argument that the jury did not necessarily determine that there was reasonable doubt as to whether Duffy was the assailant, the Government contends: (1) that "the jury may have acquitted Duffy on the ground that the Government had not proved that the robbery affected commerce, an issue that would not be an element at the retrial," Gov't Ltr. Br. at p. 2 (Jan. 31, 2002); and (2) that the jury may have acquitted Duffy because it believed that he shot the decedent over a "drug-related dispute," rather than in the course of a robbery, Gov't Ltr. Br. at p. 3 (Feb. 6, 2002).

Turning first to the commerce issue, true to the defendant's singular theory of

the case—mistaken identity—defense counsel made no mention of the commerce issue in either its opening or closing statements; moreover, defense counsel neither elicited any testimony nor cross-examined any of the Government's witnesses on this issue. The undisputed evidence was that the victims ran a landscaping business and kept their landscaping supplies in the basement of 141 Hull Street, and that the money that was the target of the attempted robbery was going to be used by the victims to purchase supplies for the business. The indictment stated that the landscaping business was the target of the attempted robbery. *See* Indictment, 01–CR–102 (Jan. 31, 2001) (the robbery was "of persons conducting a landscaping business"). Photos of the basement depicted different types of gardening supplies which the victims regularly purchased and which the Government established were not manufactured in New York State. The Court gave the standard instruction regarding the Government's *de minimis* burden of proving an effect on commerce:

> If you decide that there was any effect at all on interstate commerce, then that is enough to satisfy this element. The effect can be minimal. For example, if a successful robbery of money would prevent the use of those funds to purchase articles which travel through interstate commerce, that would be a sufficient effect on interstate commerce.

Tr. at Ct. Ex. 1 (jury charge).

In light of the defendant's concession that the "one real question in the case" was identity, his failure to raise any concern regarding the commerce issue, the Government's undisputed evidence of an effect on commerce, and the Court's instructions on the Government's *de minimis* burden, the Government's "unrealistic and hypertechnical" argument that the jury could have acquitted Duffy because it

found the evidence of an effect on commerce deficient is untenable. *Citron,* 853 F.2d at 1058.

The Government's "drug-related dispute theory" apparently arises from a videotaped statement Duffy made to the police. In that statement, Duffy said that on September 8, 1997 he went to the basement of 141 Hull Street, bought drugs and left. Duffy also said that he did not have a gun and did not shoot anyone. The Government introduced this evidence to place Duffy in the basement at the time of the robbery, not to suggest that the incident was drug-related. The crime scene detective testified that there was no indication of drug activity in the basement. The brother of the deceased testified that he and his brother ran a legitimate landscaping business. No witness testified that the assault arose out of a drug-related dispute, and neither the Government nor the defense ever mentioned such a theory during the course of the trial. Moreover, the Government told the jury in closing that the case had nothing to do with drugs:

> There is no evidence from [the defense] or from the crime scene that anyone ever sold crack, heroin or marijuana, anything in that basement. Mr. Duffy went down there to rob them. Why? Well, because they had money. From crack? No. From doing hard work.

Tr. at 398 (Jan. 22, 2002). No reasonable juror could have concluded, solely from Duffy's videotaped statement, that he shot the decedent during a drug-dispute.

In sum, viewing the evidence presented at trial, the Court's instructions on the law, the pleadings and the arguments made to the jury, with "realism and rationality," *Ashe,* 397 U.S. at 444, 90 S.Ct. 1189, the Court concludes that no "rational jury could have grounded its verdict" upon anything other than reasonable doubt that Duffy was the assailant. *McGowan,* 58

F.3d at 12. The Government is, therefore, precluded from arguing that Duffy was the assailant.

## IV

In regard to the Government's alternative argument, made orally in open court, it contends that it can prove Duffy possessed the ammunition even assuming it is collaterally estopped from arguing that he was the assailant. The Government proffers that it could present Duffy's videotaped statement to establish, contrary to the Government's prior representation to the jury, that Duffy was in the basement buying drugs, not attempting a robbery. It also submits that it could present a witness who would testify that she saw Duffy on the street outside the basement with what she believed was a gun in his pocket. The Government argues that a jury could believe these two assertions and convict Duffy on the ammunition charge without concluding that he was the shooter.

In respect to the video-taped statement, any effort by the Government to contradict its prior representation to the jury would be disingenuous, at the very least, and probably impermissible. *See Pivirotto v. Innovative Systems, Inc.,* 191 F.3d 344, 358 n. 7 (3rd Cir.1999) ("It may be true ... that an attorney's clear and unambiguous statements of fact made during opening or closing arguments can constitute judicial admissions under Federal Rule of Evidence 801(d)(2)."); *United States v. Bentson,* 947 F.2d 1353, 1356 (9th Cir. 1991) (holding that attorney's statement in closing argument can constitute judicial admission); *Wheeler v. John Deere Co.,* 935 F.2d 1090, 1097–99 (10th Cir.1991) (holding that judicial admission by party at first trial was binding on that party at the second trial).

In any event, the Government's argument is logically flawed. The ammunition that Duffy allegedly possessed were the shell casings discharged by the shooter in the basement. The Government proffers no theory to explain how the ammunition that was discharged from the shooter's gun could possibly have been possessed by Duffy if he were not the shooter. Any conceivable theory would be pure speculation, beyond the bounds of any reasonable inference. A jury could, therefore, convict Duffy of possessing the ammunition only if it believed he was the assailant. This is precisely the issue that the Government is precluded from relitigating.

## V

That the Government itself characterizes this second prosecution as a "retrial" is quite telling. Gov't Ltr. Br. at p. 2 (Jan. 31, 2002). Behind all of its hyper-technical arguments lies one basic fact that the Government cannot avoid: the Government failed to obtain a conviction in the first instance and is now looking for the proverbial second bite at the apple. "Allowing a second jury to reconsider the very issue upon which the defendant has prevailed serves no valuable function. To the contrary, it implicates concerns about the injustice of exposing a defendant to repeated risks of conviction for the same conduct, and to the ordeal of multiple trials, that lie at the heart of the double jeopardy clause." *Mespoulede,* 597 F.2d at 337. The indictment is dismissed.

**SO ORDERED.**