STATE OF NORTH CAROLINA v. SHAN CARTER

No. 479A01

(Filed 22 August 2003)

**1. Witnesses— cross-examination—repetitive and confrontational**

The trial court did not err during a capital sentencing proceeding by denying defendant the opportunity to further cross-examine and impeach the credibility of a State's witness. The court limited cross-examination only after it became repetitive and confrontational.

**2. Sentencing— capital—prior inconsistent statement about another crime—extrinsic evidence excluded**

The trial court did not err in a capital sentencing hearing by refusing to admit a signed police report about another crime as extrinsic evidence of a witness's prior inconsistent statement. The point in contention was a collateral matter only tenuously relevant, and the court exercised its discretion properly to prevent this sentencing proceeding from becoming a second trial for the prior crime.

**3. Constitutional Law— double jeopardy—current murder introduced at sentencing for prior murder—life sentence not acquittal**

A sentence of life imprisonment for a prior murder did not amount to an "acquittal" for this murder even though evidence of this murder was introduced at the capital sentencing hearing to support the course of conduct aggravating circumstance. Neither defendant's guilt nor the appropriate sentence in the present case were fully litigated in the prior trial, and defendant was convicted and sentenced in this case for offenses quite distinct from the offenses in the prior trial.

STATE v. CARTER

[357 N.C. 345 (2003)]

### 4. Sentencing— capital—prior life sentence excluded

There was no prejudicial error in a capital sentencing proceeding in the court's granting of the State's motion in limine to exclude defendant's life sentence in another case where the clerk of court testified about the earlier sentence without objection. Moreover, the sentence imposed for the prior murder was irrelevant to the sentencing recommendation in this case.

### 5. Criminal Law— self-defense—instructions

The trial court did not err in a first-degree murder prosecution by instructing the jury that defendant's conduct could be excused if it appeared necessary to the defendant and he believed it to be necessary that he kill the victim to save himself from death or great bodily harm. Although defendant argued that this instruction deprived defendant of self-defense even if the jury found that the victim suffered injuries greater than defendant had intended, an instruction identical in all relevant respects was approved in State v. Richardson, 341 N.C. 585.

### 6. Homicide— first-degree murder—short-form indictment— constitutional

A short-form first-degree murder indictment, which did not allege aggravating circumstances, was not unconstitutional. The structure and nature of the North Carolina capital punishment system provided defendant with reasonable and constitutionally sufficient notice of the aggravating circumstances that might be established by the State during defendant's capital sentencing proceeding. The indictment sufficiently alleged the elements of first-degree murder.

### 7. Sentencing— capital—death penalty—not arbitrary

The evidence fully supported the aggravating circumstances found by the jury in a capital sentencing proceeding, and there was no indication that the death sentences were imposed under the influence of passion, prejudice, or any other arbitrary consideration.

### 8. Sentencing— capital—death penalty—proportionate

A death sentence was proportionate where defendant was convicted of first-degree murder based on premeditation and deliberation, defendant was found guilty of two counts of murder, defendant had been convicted of a prior violent felony, the jury found the course of conduct aggravating circumstance, and

the jury expressly refused to find the statutory mitigating circumstances of mental or emotional disturbance or age.

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from judgments imposing sentences of death entered by Judge Charles H. Henry on 19 March 2001 in Superior Court, New Hanover County, upon jury verdicts finding defendant guilty of two counts of first-degree murder. On 22 July 2002, the Supreme Court allowed defendant's motion to bypass the Court of Appeals as to his appeal of additional judgments. Heard in the Supreme Court 11 March 2003.

*Roy Cooper, Attorney General, by Joan M. Cunningham, Assistant Attorney General, for the State.*

*Edwin L. West, III, for defendant-appellant.*

MARTIN, Justice.

On 24 February 1997, Shan Carter (defendant) was indicted for the first-degree murders of Tyrone Baker and Demetrius Greene. He was also subsequently indicted for discharging a firearm into occupied property, in violation of N.C.G.S. § 14-34.1, and possession of a firearm by a convicted felon, in violation of N.C.G.S. § 14-415.1. Defendant was tried capitally at the 5 February 2001 session of Superior Court, New Hanover County. The jury found defendant guilty on all counts. Defendant's conviction of the first-degree murder of Baker was based on a theory of premeditation and deliberation. Defendant's conviction of the first-degree murder of Greene was based on a theory of premeditation and deliberation under the doctrine of transferred intent, and was also based on the felony murder rule with Baker's murder serving as the underlying felony. Following a capital sentencing proceeding, the jury recommended a sentence of death for each murder. The trial court entered judgment accordingly. The trial court also entered consecutive sentences of forty-six to sixty-five months for discharge of a firearm into an occupied vehicle and twenty to twenty-four months for possession of a firearm by a convicted felon. Defendant gave notice of appeal pursuant to N.C.G.S. § 7A-27(a).

The evidence admitted at the guilt-innocence proceeding tended to show the following: Defendant has been convicted several times of illegal drug possession and sale. In late 1996, defendant was involved in a number of break-ins and burglaries in Wilmington, North Carolina, including one at the home of Keith Lamont Richardson and

one at the home of a victim in the instant case, Tyrone Baker. Defendant, K'Wada Temony, and Damont White were all involved in the burglary of Baker's home, which resulted in the theft of approximately $35,000 in cash. At one point, defendant referred to this $35,000 as "death money." No evidence was admitted as to what, if anything, defendant may have stolen from Richardson. Richardson and Baker each eventually confronted defendant and his cohorts. One of these confrontations led to the convictions in the instant case.

Sometime near the end of November 1996, Baker kidnapped White and took him to Baker's apartment. Baker assaulted and threatened White in an attempt to discover the location of the missing $35,000. Baker then released White, who discussed the incident with Temony and defendant and alerted them that Baker was searching for those who had taken his money. In early February 1997, Richardson learned that defendant was the person who had broken into his home. Richardson subsequently saw defendant on the street and angrily confronted him about the break-in. During the confrontation, defendant drew a chrome .357 caliber revolver and Richardson fled. Defendant fired several shots, wounding Richardson's arm.

The instant charges stem from events occurring on the afternoon of 16 February 1997. On that afternoon, defendant and Temony were riding in defendant's car. They stopped near a crowd of ten to fifteen people gathered in front of a grocery store located at the intersection of 10th and Dawson Streets in Wilmington. A number of residents were out on the neighborhood streets that day. Defendant and Temony exited the car; defendant began conducting drug transactions. Baker was also near this intersection, having visited a friend's house across the street from the grocery store and a nearby barber shop.

Defendant apparently did not notice Baker approach the crowd. Defendant first became aware of Baker's presence when Baker attacked Temony, knocking him to the ground. Baker then approached defendant menacingly, with a jacket slung over his arm, concealing his hand. According to eyewitnesses, Baker was unarmed. Defendant claimed at trial that although he could not see a weapon, he feared Baker was armed and reacted in self-defense. Defendant testified: "I didn't want to shoot first, I wanted to go ahead . . . and do what I had to do before [Baker] did it to me. So I went ahead and pulled my gun out and I shot at him." As Baker approached, defend-

ant retreated, pulled a chrome .357 caliber revolver from under his jacket, and began shooting. Defendant testified that he pointed his gun towards the ground and intended only to force Baker away so that defendant could get to his car and leave. Defendant also testified that he did not intend to kill Baker and did not know at the time of the shooting whether any of the bullets actually hit Baker. After defendant fired the first shot, Baker turned and ran around the corner, moving down 10th Street. According to defendant, "[Baker] ran and I went behind him shooting at him."

D'April Greene and her three children lived in a housing project near 10th and Dawson. On 16 February 1997, D'April was gathering the children for a trip to the toy store. The trip was intended to reward the children for making good grades. Excited about the trip and anxious to ride in the front seat, D'April's eight-year-old son, Demetrius, ran ahead of the rest of his family. He ran across 10th Street and jumped into the front passenger seat of D'April's car, which was parked on 10th Street approximately one hundred feet south of the grocery store. As D'April and her other two children crossed the street towards the car, D'April began to hear "fussing" near the intersection of 10th and Dawson. This "fussing" was quickly followed by gunfire. D'April and other witnesses then saw Baker rounding the corner with defendant in pursuit.

As Baker ran down 10th Street, defendant followed him around the corner, continuing to fire between four and six shots. At some point, Baker ran in front of or near the Greene car in an attempt to cross 10th Street. During the course of the shooting, two of the bullets from defendant's revolver struck Baker, one in the leg and one in the torso. Baker staggered across the street, collapsed in a grassy area near the sidewalk, and died shortly thereafter. A stray bullet from defendant's revolver passed through the windshield of D'April Greene's car and struck Demetrius Greene in the head. Demetrius died shortly thereafter. Forensic evidence subsequently confirmed that the bullets that struck Baker and Greene all came from the same gun, most likely a revolver. Moreover, forensic evidence showed those bullets could not have been fired from a gun later found in Temony's possession.

Immediately after the shooting, defendant and Temony got into defendant's car and fled. They stopped briefly at defendant's home, abandoned defendant's car, and then went to a nearby motel. According to defendant, they spent the next two days in a motel room. Defendant claims he did not learn that Demetrius Greene had

been killed until he saw the evening news. At some point, Temony disposed of defendant's revolver.

Meanwhile, police interviewed D'April Greene and other witnesses and obtained an identification of defendant as the shooter. Police subsequently searched defendant's home and car. The officers found, among other things, gun holsters, drug trade paraphernalia, a shotgun, and some .357 caliber ammunition. On 18 February 1997, police received information that defendant had requested a taxicab at his motel. The officers used this opportunity to arrest defendant, sending a plain clothes officer to the motel to pose as a taxi driver. As the police arrived at the motel, defendant and Temony spotted them and ran. Defendant threw his jacket to the ground as he fled. After a brief foot chase, police arrested defendant and Temony.

Additional evidence admitted during the capital sentencing proceeding tended to show the following: In the early morning hours of 18 February 1997, two masked, armed intruders broke into an apartment on Ringo Drive in Wilmington and attacked Louis Tyson. The intruders forced Tyson to the floor and attempted to bind him with duct tape. The intruders beat Tyson while demanding money and then shot Tyson once in each leg. The intruders then fled. Paper dust masks and remnants of the duct tape were found at the scene. Defendant was linked to the Tyson attack by evidence that: (1) duct tape and paper dust masks matching those used during the Tyson attack were found in defendant's motel room after his arrest in the present case; (2) police found a shopping list, in defendant's handwriting, in the pocket of the jacket defendant dropped when fleeing the police, and among the items on the list were duct tape, masks, and gloves; and (3) bloodstains found on this same jacket were genetically matched to Tyson's blood.

Evidence was also introduced concerning the murder of Donald Brunson. In the early morning hours of 6 December 1996, two intruders broke into the house where Brunson lived. Ana Santiago, who was Brunson's girlfriend, and her son Carlos both lived with Brunson. The intruders awoke Brunson, Santiago, and Carlos at gunpoint and ordered them to lie down on the master bedroom floor. At some point, the intruders became angry. A shot was fired, and the intruders began beating Brunson. The intruders dragged Brunson to Carlos' room and continued to beat him until he was unconscious. Then they tied up all three victims. The intruders placed Brunson in Santiago's car and left, taking the car and Brunson with them. In the morning, the car was found near the local waste-water treatment plant.

Brunson's nearly nude body was found nearby. He had died as a result of gunshot wounds to his back. Temony and defendant were charged in connection with the Brunson case after their arrest in the present case. In connection with the Brunson murder, Temony pled guilty to second-degree murder, kidnapping, robbery, and burglary. Defendant was convicted of first-degree murder, kidnapping, and robbery with a dangerous weapon.

Defendant presented a number of family members and friends as witnesses during the capital sentencing proceeding. These witnesses testified as to defendant's childhood, which included frequent moves, the separation of his parents, and the deterioration of his relationship with his father. There was testimony that defendant had generally stayed out of trouble until he and his family moved to Wilmington. There was also testimony that defendant maintains a good relationship with his parents, siblings, nieces, and nephews.

The additional facts and descriptions of events at trial necessary to an understanding of defendant's arguments are set forth below.

[1] Defendant first contends the trial court erred by denying defendant the opportunity to fully cross-examine and impeach the credibility of one of the state's witnesses. During the capital sentencing proceeding, the state presented evidence describing the circumstances of the Brunson murder. Defendant's convictions arising from the Brunson murder were used in support of aggravating circumstances described in N.C.G.S. § 15A-2000(e)(2) (defendant previously convicted of a capital felony) and N.C.G.S. § 15A-2000(e)(3) (defendant previously convicted of a felony involving the use or threat of violence to the person). Ana Santiago appeared as a witness for the state and described the events that had occurred in the Brunson home on the night of the attack. During her testimony, she stated that there had been two intruders in the house that night.

During cross-examination, defendant questioned Santiago about prior statements she had made to police during the investigation of the Brunson murder and during her testimony at the Brunson murder trial. In those prior statements, Santiago had stated that three, not two, intruders had entered the Brunson home. Defendant questioned Santiago several times about these prior inconsistent statements without objection. Each time, Santiago claimed she did not recall making those prior statements. The trial court sustained the state's objections to further inquiry as to these statements and refused to admit a police report, signed by Santiago, stating that three men had

entered the Brunson home. On *voir dire*, the police report was admitted as an offer of proof. After some discussion with counsel, the trial court ruled that defendant had ample opportunity to cross-examine the witness on the issue and that further inquiry was irrelevant to the key fact for sentencing purposes—the existence of defendant's prior convictions.

A person may not be sentenced to death " 'on the basis of information which he had no opportunity to deny or explain.' " *Simmons v. South Carolina*, 512 U.S. 154, 161, 129 L. Ed. 2d 133, 141 (1994) (quoting *Gardner v. Florida*, 430 U.S. 349, 362, 51 L. Ed. 2d 393, 404 (1977) (plurality opinion)). Accordingly, under North Carolina law, at a capital sentencing proceeding both the state and the defendant may introduce evidence concerning the circumstances surrounding the defendant's prior crimes when those prior crimes support aggravating circumstances. *State v. McDougall*, 308 N.C. 1, 20-21, 301 S.E.2d 308, 320 (following *State v. Taylor*, 304 N.C. 249, 279, 283 S.E.2d 761, 780 (1981), *cert. denied*, 463 U.S. 1213, 77 L. Ed. 2d 1398 (1983)), *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 173 (1983). Once the state introduces evidence of the circumstances surrounding these prior crimes, it is anticipated that the defendant may elicit testimony tending to temper that evidence. *State v. Jones*, 339 N.C. 114, 152, 451 S.E.2d 826, 846 (1994), *cert. denied*, 515 U.S. 1169, 132 L. Ed. 2d 873 (1995).

The admission of evidence during a capital sentencing proceeding, however, is not strictly governed by the Rules of Evidence. N.C.G.S. § 15A-2000(a)(3) (2001); N.C.G.S. § 8C-1, Rule 1101(b)(3) (2001). In *McDougall*, this Court described the role of the trial court in controlling the presentation of evidence concerning the circumstances surrounding prior crimes to be used as aggravating circumstances at a capital sentencing proceeding:

It is the duty of the trial judge to supervise and control the trial to prevent injustice to either party. The court has the power and duty to control the examination and cross-examination of the witnesses. The trial judge may ban unduly repetitious and argumentative questions as well as inquiry into matters of tenuous relevance. The extent of cross-examination with respect to collateral matters is largely within the discretion of the trial judge. The proper exercise of this authority will prevent the determination of this aggravating circumstance from becoming a "minitrial" of the previous charge.

**STATE v. CARTER**

[357 N.C. 345 (2003)]

*McDougall*, 308 N.C. at 22, 301 S.E.2d at 321 (citations omitted); *see also State v. Locklear*, 349 N.C. 118, 158, 505 S.E.2d 277, 300 (1998) (trial court may exclude evidence during capital sentencing that is "repetitive, unreliable, or lacking an adequate foundation"), *cert. denied*, 526 U.S. 1075, 143 L. Ed. 2d 559 (1999); *State v. Strickland*, 346 N.C. 443, 461, 488 S.E.2d 194, 205 (1997) (admissibility of evidence during capital sentencing is based upon considerations of whether the evidence is "pertinent and reliable"), *cert. denied*, 522 U.S. 1078, 139 L. Ed. 2d 757 (1998); *State v. Walls*, 342 N.C. 1, 51, 463 S.E.2d 738, 764-65 (1995) (a trial court may exclude evidence of a mitigating circumstance which is repetitive or unreliable), *cert. denied*, 517 U.S. 1197, 134 L. Ed. 2d 794 (1996). A trial court has broad discretion over the scope of cross-examination in general and during a sentencing proceeding in particular. *State v. Moses*, 350 N.C. 741, 770-71, 517 S.E.2d 853, 871 (1999), *cert. denied*, 528 U.S. 1124, 145 L. Ed. 2d 826 (2000); *State v. Anderson*, 350 N.C. 152, 180, 513 S.E.2d 296, 313, *cert. denied*, 528 U.S. 973, 145 L. Ed. 2d 326 (1999).

Defendant was not denied an opportunity to cross-examine Santiago concerning her prior statements. He was allowed to question Santiago repeatedly concerning her prior inconsistent statements. The transcript reveals that it was only after the tone of the cross-examination became repetitive and somewhat confrontational that the trial court asked defense counsel to "move along" and sustained the state's objections to defendant's repeated questions. The trial court properly exercised its broad discretion when it limited defendant's cross-examination in this manner.

**[2]** Nor did the trial court err in refusing to admit extrinsic evidence of Santiago's prior statement, namely, the signed police report. While the Rules of Evidence are not controlling in a sentencing proceeding, they can provide a helpful guide as to relevance. *State v. Greene*, 351 N.C. 562, 568, 528 S.E.2d 575, 579, *cert. denied*, 531 U.S. 1041, 148 L. Ed. 2d 543 (2000). As a general rule, under the Rules of Evidence, once a witness testifies about a collateral matter on cross-examination, the cross-examiner is bound by those answers of the witness and cannot contradict them with extrinsic evidence. 1 Kenneth S. Broun, *Brandis and Broun on North Carolina Evidence* § 160 (5th ed. 1998); *see also State v. Burke*, 343 N.C. 129, 154, 469 S.E.2d 901, 913, *cert. denied*, 519 U.S. 1013, 136 L. Ed. 2d 409 (1996). Repetitive evidence on irrelevant points serves only to prolong the trial and confuse the jury. Broun, *North Carolina Evidence* at § 160.

In the present case, the exact number of attackers who entered the Brunson home was a collateral matter, and was only tenuously relevant to the fact that defendant was convicted of several felonies in connection with the Brunson murder. Santiago's prior inconsistent statements were relevant to her credibility and defendant was allowed to explore that issue. In sustaining the state's objection to admission of the police report, the trial court properly exercised its discretion to prevent the sentencing proceeding from becoming a second trial of the Brunson murder and to prevent an unnecessary digression into a collateral matter. Defendant's argument is without merit.

[3] Next, defendant argues the trial court erred by denying defendant's pretrial motion to dismiss. During the capital sentencing proceeding at defendant's earlier trial for the Brunson murder, the state introduced evidence of the murders of Tyrone Baker and Demetrius Greene in support of the aggravating circumstance described in N.C.G.S. § 15A-2000(e)(11) (the murder was part of a course of conduct in which the defendant engaged in other violent crimes). The state introduced the testimony of D'April Greene; Roderick Morgan, who was an eyewitness to the murders of Tyrone Baker and Demetrius Greene; and Dr. Almeida, who performed the autopsies of Tyrone Baker and Demetrius Greene. The Brunson jury found the existence of the course of conduct aggravating circumstance and recommended life imprisonment without parole.

D'April Greene, Roderick Morgan, and Dr. Almeida testified during the guilt-innocence proceeding in the instant case as well. Prior to trial, defendant moved to dismiss the murder charges on double jeopardy and collateral estoppel grounds. Defendant argued that the capital sentencing proceeding in the Brunson trial was, in part, a trial of the Baker and Greene murders. According to defendant, because the jury in the Brunson trial had already considered evidence of the Baker and Greene murders and had been authorized to impose a sentence of death based in part upon the Baker and Greene murders, defendant's life had already been placed in jeopardy once for those crimes. In effect, defendant argued, the jury's recommendation of life imprisonment without parole in the Brunson trial "acquitted" defendant of the death penalty for the Baker and Greene murders. In his written motion, defendant moved for dismissal of the murder charges. During the hearing on the motion, defendant argued in the alternative that if trial proceeded, the state should be collaterally estopped from seeking the death penalty. The trial court denied defendant's motion and noted his exception.

On appeal, defendant renews this argument. In his brief, defendant relies principally on *Ashe v. Swenson,* 397 U.S. 436, 25 L. Ed. 2d 469 (1970), to support his argument that the state should have been collaterally estopped from seeking the death penalty in the present case. In *Ashe,* the defendant was charged with seven separate crimes in the robbery of a group of six poker players. *Id.* at 437-38, 25 L. Ed. 2d at 472. The defendant was to be tried separately on each count but was acquitted on the first count for lack of evidence. The state then brought the defendant to trial on the second count. *Id.* at 439, 25 L. Ed. 2d at 472-73. The United States Supreme Court held that the doctrine of collateral estoppel, as embodied in the rule against double jeopardy, prevented further prosecutions of the defendant for other crimes arising out of those same facts. *Id.* at 446-47, 25 L. Ed. 2d at 477. According to defendant, the present case is analogous.

Defendant's reliance on *Ashe* is misplaced. *Ashe* stands for the proposition that once a jury has conclusively determined the existence or nonexistence of a fact, the state is collaterally estopped under the Double Jeopardy Clause from relitigating that same issue in a second criminal proceeding. *Id.* at 442-43, 25 L. Ed. 2d at 475; *see also Schiro v. Farley,* 510 U.S. 222, 232, 127 L. Ed. 2d 47, 58 (1994). The holding in *Ashe* turned on the fact that the only "rationally conceivable issue in dispute" was whether defendant was in fact one of the robbers, and the first jury had expressly found the evidence insufficient to prove that fact. 397 U.S. at 445, 25 L. Ed. 2d at 476. There was no issue as to whether the defendant in *Ashe* could be properly charged and punished for each of the robberies if he was, in fact, one of the robbers. *Id.* at 446, 25 L. Ed. 2d at 477. The acquittal of a defendant in a previous proceeding only "precludes the state from relitigating in a subsequent prosecution any issue *necessarily* decided in favor of the defendant in the former acquittal." *State v. McKenzie,* 292 N.C. 170, 175, 232 S.E.2d 424, 428 (1977). The key inquiry is, " 'taking into account the pleadings, evidence, charge, and other relevant matter, . . . whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration.' " *Ashe,* 397 U.S. at 444, 25 L. Ed. 2d at 475-76 (quoting Daniel K. Mayers & Fletcher L. Yarbrough, *Bis Vexari: New Trials and Successive Prosecutions,* 74 Harv. L. Rev. 1, 38-39 (1960)); *see also McKenzie,* 292 N.C. at 174, 232 S.E.2d at 428. Defendant has the burden of demonstrating that the issue he seeks to foreclose from relitigation was actually decided in the previous pro-

ceeding. *Schiro*, 510 U.S. at 233, 127 L. Ed. 2d at 59; *McKenzie*, 292 N.C. at 175, 232 S.E.2d at 428.

Defendant's argument is based on the fact that the state produced evidence at the present trial that was similar to evidence produced at the sentencing proceeding in the Brunson trial. The similarity of the evidence introduced in the two proceedings is not the test. *See State v. Alston*, 323 N.C. 614, 617, 374 S.E.2d 247, 249 (1988). The test is whether the jury in the Brunson trial could have rationally grounded its recommendation of life imprisonment on an issue other than the aggravating value of the Baker and Greene murders. *See id.*

Defendant's guilt of the offenses charged in the present case was never fully litigated during the Brunson trial, and neither was the appropriate sentence for the present crimes. Our examination of the transcript and exhibits from the Brunson trial, placed in the present record on appeal, reveals that the Brunson jury was never required to find the existence of all of the elements of first-degree premeditated and deliberate murder as to the Baker and Greene murders. Moreover, although some evidence of the Baker and Greene murders was presented to the Brunson jury, evidence concerning defendant's violent acts towards Keith Richardson and Louis Tyson was also presented during the sentencing and guilt-innocence proceedings of the Brunson trial. The jury's finding of the course of conduct aggravating circumstance in the Brunson trial could have been based on defendant's other violent acts and was not *necessarily* based on any finding as to the Baker and Greene murders. Defendant did not stand charged with the Baker and Greene murders during the Brunson trial, nor was he prosecuted for them. Although defendant's pattern of violent conduct, including the murders charged in the instant case, was possibly relevant to a determination of the appropriate punishment for the Brunson murder, the jury in the Brunson trial ultimately decided defendant's guilt and recommended a sentence for the Brunson murder alone.

This Court has rejected similar arguments in the past. In *State v. Williams*, 305 N.C. 656, 680-81, 292 S.E.2d 243, 258, *cert. denied*, 459 U.S. 1056, 74 L. Ed. 2d 622 (1982), the defendant was tried and convicted separately of two murders, committed hours apart in Gaston and Cabarrus Counties. The defendant was first tried and convicted for the Cabarrus County murder. Evidence of the Gaston County murder was introduced at the Cabarrus County trial to support a finding of an aggravating circumstance and defendant was sentenced to death. The defendant was then tried and convicted for the Gaston

County murder. The jury in the Gaston County case found that the Cabarrus County murder supported a finding of an aggravating circumstance and recommended a sentence of death.

On appeal, the defendant argued that because the jury at the Cabarrus County trial had already considered the facts of the Gaston County murder and had already sentenced him based in part upon those facts, he could not be tried for the Gaston County murder consistent with double jeopardy protections. In the alternative, the defendant argued that the Cabarrus County murder could not be used to support aggravating circumstances at the capital sentencing proceeding of the Gaston County trial. This Court flatly rejected the defendant's argument, noting: "The defendant was not convicted of nor punished for the [Gaston County murder] in the prior trial. The defendant has been convicted and sentenced only once for the [Gaston County murder] and will only once be punished therefor." *Id.* at 681, 292 S.E.2d at 258.

In a different case, a defendant was convicted of two murders and each murder was used to support the (e)(11) aggravating circumstance in the sentencing proceeding for the other murder. *State v. Pinch*, 306 N.C. 1, 29, 292 S.E.2d 203, 225, *cert. denied*, 459 U.S. 1056, 74 L. Ed. 2d 622 (1982), *and overruled in part on other grounds by State v. Rouse*, 339 N.C. 59, 451 S.E.2d 543 (1994), *cert. denied*, 516 U.S. 832, 133 L. Ed. 2d 60 (1995), *and by State v. Robinson*, 336 N.C. 78, 443 S.E.2d 306 (1994), *cert. denied*, 513 U.S. 1089, 130 L. Ed. 2d 650 (1995), *and by State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988), *and abrogated in part on other grounds by State v. Wilson*, 322 N.C. 117, 367 S.E.2d 589 (1988). In his brief to this Court, the defendant argued this was unconstitutional because " '[t]he double jeopardy clause prohibits the prosecution from . . . obtaining a substantive conviction for a homicide and then using it again as an aggravating circumstance.' " *Id.* at 30, 292 S.E.2d at 225. This Court responded:

> [T]he jury's *consideration* of a defendant's commission of "other crimes of violence," in making its ultimate penalty recommendation for that defendant's conviction of a related but separate capital offense, is not logically equivalent to the defendant receiving multiple punishment for the same crime.

*Id.* at 31, 292 S.E.2d at 226; *see also State v. Boyd*, 343 N.C. 699, 719-20, 473 S.E.2d 327, 338 (1996) (in a double homicide, submission of the facts of one homicide to aggravate the sentence imposed in the

trial of the other homicide does not violate double jeopardy), *cert. denied*, 519 U.S. 1096, 136 L. Ed. 2d 722 (1997).

Although the instant case is not identical to these cases, defendant's argument is sufficiently analogous to the arguments discussed therein that we believe they control the outcome here. Defendant was not convicted of the Baker and Greene murders at the Brunson trial and has been convicted and sentenced only once for the Baker and Greene murders. The Brunson jury's consideration of the instant crimes as an aggravating circumstance in a prior capital sentencing proceeding is not logically equivalent to the defendant having already received either punishment or acquittal of the present crimes. The double jeopardy clause protects against a second prosecution or second punishment *for a single offense. Pinch*, 306 N.C. at 31, 292 S.E.2d at 226; *see also Schiro*, 510 U.S. at 229, 127 L. Ed. 2d at 56; *State v. Thompson*, 349 N.C. 483, 495, 508 S.E.2d 277, 284 (1998). In the case at bar, defendant was convicted and sentenced for two offenses quite distinct from the offenses tried at the Brunson trial. It was "entirely proper" for each jury to consider defendant's pattern of violent behavior when "determining whether defendant should pay the ultimate price for *each* life he took." *Pinch*, 306 N.C. at 32, 292 S.E.2d at 226. Accordingly, "we decline to adopt a position which would prevent the administration and availability of equal justice for equal crimes." *Id.* at 30, 292 S.E.2d at 225. Defendant's argument is without merit.

**[4]** Next, defendant argues the trial court erred during sentencing by excluding evidence as to the sentence recommended and imposed in the Brunson trial. Prior to the capital sentencing proceeding, the trial court allowed the state's motion *in limine* and precluded defendant from mentioning during opening statements that the jury in the Brunson trial had recommended a sentence of life imprisonment. During the sentencing proceeding, the trial court also sustained the state's objection to the admission of the full case file from the Brunson trial, which contained the jury's sentencing recommendation. According to defendant, this may have misled the jury into believing that defendant was already under a sentence of death for the Brunson murder. Defendant argues such a misled jury might erroneously assume that its death verdict would be superfluous. Thus, the jury might mistakenly believe that it bore no actual responsibility for defendant's death. According to defendant, the trial court's ruling is therefore contrary to the legal principles discussed in *Caldwell v. Mississippi*, 472 U.S. 320, 328-29, 86 L. Ed. 2d 231, 239 (1985).

At the outset, we note that the jury was made aware of defendant's sentence for the Brunson murder. The clerk of court testified as to defendant's sentence in the Brunson trial, and this testimony was admitted without objection. It is therefore difficult to see how the jury was misled on this issue. Assuming *arguendo* that the trial court erred at all in excluding such evidence, the fact that this same evidence was admitted without objection at a different point makes any alleged error likely harmless. *See State v. Lee,* 335 N.C. 244, 280, 439 S.E.2d 547, 565-66, *cert. denied,* 513 U.S. 891, 130 L. Ed. 2d 162 (1994).

Moreover, *Caldwell* is not controlling here. The constitutional violation described in *Caldwell* involved a prosecutor telling a jury that it need not feel the full weight of its responsibility for deciding a death sentence, because an appellate court would review its determination and make the final decision to impose the death penalty. *Caldwell,* 472 U.S. at 325-26, 86 L. Ed. 2d at 237-38. The United States Supreme Court held this argument misleading and prejudicial because " '[e]ven a novice attorney knows that appellate courts do not impose a death penalty, they merely review the jury's decision and that review is with a presumption of correctness.' " *Id.* at 331, 86 L. Ed. 2d at 241 (quoting with approval the dissenting opinion below, *Caldwell v. State,* 443 So. 2d 806, 816 (Miss. 1983) (Lee, J., dissenting)). In the present case, allowing the state's motion *in limine* and sustaining the state's objections could not have led the jury to believe that some other tribunal would finally decide defendant's sentence or that the jury's sentencing recommendation was somehow not binding. There is no indication that the trial court's rulings encouraged the jury to ignore its grave responsibility. As to the crimes charged in the instant case, the decision as to punishment was the jury's alone and neither side intimated otherwise.

*Caldwell* is based, at least in part, on the considerations articulated in a case that seems more directly relevant here, *Lockett v. Ohio,* 438 U.S. 586, 57 L. Ed. 2d 973 (1978) (plurality opinion). The general rule that the jury must not be misled as to its role in a capital sentencing proceeding is "rooted in a concern that the [capital] sentencing process should facilitate the responsible and reliable exercise of sentencing discretion." *Caldwell,* 472 U.S. at 329, 86 L. Ed. 2d at 239 (citing *Lockett* and several other cases). In *Lockett,* the United States Supreme Court held that a sentencer in a capital sentencing proceeding may "not be precluded from considering, *as a mitigating factor,* any aspect of a defendant's character or record and any of

the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." 438 U.S. at 604, 57 L. Ed. 2d at 990.

The types of considerations described in *Lockett, Caldwell,* and other cases do not require the admission of the evidence proffered here. Even in light of these considerations, a trial court is not limited in its authority to exclude irrelevant evidence. *Lockett,* 438 U.S. at 604 n.12, 57 L. Ed. 2d at 990 n.12. In other cases, this Court has held that a defendant's potential or actual sentence for crimes other than the crime of which he or she stands convicted is irrelevant to a determination of a proper sentence and thus may be properly excluded. *Robinson,* 336 N.C. at 105-06, 443 S.E.2d at 319 (defendant's sentences for other crimes arising from the same transaction are irrelevant to sentencing determination); *Lee,* 335 N.C. at 279-80, 439 S.E.2d at 565 (trial court properly excluded as irrelevant evidence that defendant would be sentenced separately for his additional crimes); *see also State v. Reeves,* 337 N.C. 700, 720, 448 S.E.2d 802, 810 (1994) (convictions and sentences for other crimes are not mitigating evidence), *cert. denied,* 514 U.S. 1114, 131 L. Ed. 2d 860 (1995); *cf. State v. Robbins,* 319 N.C. 465, 518, 356 S.E.2d 279, 310 (defendant's status under the parole laws is irrelevant to a sentencing determination), *cert. denied,* 484 U.S. 918, 98 L. Ed. 2d 226 (1987). "That defendant is currently serving a life sentence for another unrelated crime is not a circumstance which tends to justify a sentence less than death for the capital crime for which defendant is being sentenced." *State v. Price,* 331 N.C. 620, 634, 418 S.E.2d 169, 177 (1992), *sentence vacated on other grounds,* 506 U.S. 1043, 122 L. Ed. 2d 113 (1993).

In sum, the jury heard the evidence defendant claims was wrongly excluded: that he had been sentenced to life imprisonment at his trial for the murder of Donald Brunson. Moreover, even if the evidence had been entirely excluded, there would be no error because the sentence imposed on defendant for the Brunson murder was irrelevant to the jury's sentencing recommendation in the present case. Defendant's argument is without merit.

[5] Defendant next argues that the trial court gave an erroneous instruction on the issue of self-defense. Prior to the jury deliberations at the end of the guilt-innocence proceeding, the trial court instructed the jury that defendant's conduct could be excused on the basis of self-defense if "it appeared necessary to the defendant and he believed it to be necessary to kill Tyrone Baker in order to save himself from death or great bodily harm." At trial, defendant admitted to

firing his gun generally in Baker's direction but claimed he aimed at the ground and did not mean to kill Baker. According to defendant, this instruction incorrectly required the jury to find that defendant believed it necessary to use a particular level of force, namely, deadly force, before he could claim self-defense. Defendant argues this instruction deprived him of the excuse of self-defense even if the jury found Baker had suffered injuries greater than defendant had anticipated.

We addressed this issue in *State v. Richardson*, 341 N.C. 585, 461 S.E.2d 724 (1995). In *Richardson*, we approved a jury instruction that was, in all relevant respects, identical to the instruction at issue in the present case. *Id.* at 587, 597, 461 S.E.2d at 726, 731. Since *Richardson*, we have declined opportunities to reconsider the issue. *See, e.g.,* *State v. Laws*, 345 N.C. 585, 600, 481 S.E.2d 641, 649 (1997); *State v. Johnson*, 343 N.C. 489, 494, 471 S.E.2d 409, 412 (1996). After carefully examining defendant's argument, we find no reason to depart from our prior holdings. This argument is without merit.

[6] Defendant next contends that the short-form indictments charging him with murder erroneously failed to allege the aggravating circumstances serving as the basis for imposition of the death penalty. Defendant claims that aggravating circumstances must be alleged in his indictment pursuant to the United States Supreme Court decision in *Ring v. Arizona*, 536 U.S. 584, 153 L. Ed. 2d 556 (2002).

Defendant's argument is foreclosed by this Court's decision in *State v. Hunt*, 357 N.C. 257, 582 S.E.2d 593 (2003). As explained in *Hunt*, the United States Supreme Court's decision in *Ring* does not require that aggravating circumstances be alleged in a state-court murder indictment. *Id.* at 274, 582 S.E.2d at 604. This Court in *Hunt* also held that there is no statutory requirement that a short-form murder indictment contain aggravating circumstances. *Id.* at 272-73, 582 S.E.2d at 603-04. Prior to trial, defendant made a general assertion that failure to allege the aggravating circumstances in his indictment violated his due process rights. We review this alleged constitutional error pursuant to N.C.G.S. § 15A-1443(b). For reasons similar to those stated in *Hunt*, we determine beyond a reasonable doubt that the structure and nature of the North Carolina capital punishment system provided defendant with reasonable and constitutionally sufficient notice of the aggravating circumstances that might be established by the state during defendant's capital sentencing proceeding. *See id.* at 274-78, 582 S.E.2d at 604-06. This assignment of error is without merit.

Additionally, defendant contends that the short-form murder indictment used to charge him improperly alleged only the elements of second-degree murder and omitted the additional elements necessary to allege first-degree murder. Defendant concedes, as he must, that this Court has consistently rejected this argument. *See, e.g., State v. Barden*, 356 N.C. 316, 383-84, 572 S.E.2d 108, 150 (2002), *cert. denied,* —— U.S. ——, 155 L. Ed. 2d 1074 (2003); *State v. Braxton*, 352 N.C. 158, 174-75, 531 S.E.2d 428, 437 (2000), *cert. denied,* 531 U.S. 1130, 148 L. Ed. 2d 797 (2001); *State v. Wallace*, 351 N.C. 481, 508, 528 S.E.2d 326, 343, *cert. denied,* 531 U.S. 1018, 148 L. Ed. 2d 498 (2000); *see also Hunt,* 357 N.C. at 275, 582 S.E.2d at 604. We have considered defendant's contention on this issue and find no reason to depart from our prior holdings.

[7] Having concluded that defendant's trial and capital sentencing proceeding were free from prejudicial error, we are required to determine: (1) whether the record supports the jury's finding of any aggravating circumstances upon which the sentencing court based its sentence of death; (2) whether the death sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor; and (3) whether the death sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. N.C.G.S. § 15A-2000(d)(2).

In the present case, defendant was convicted of two counts of murder, one count of discharging a firearm into occupied property, and one count of possession of a firearm by a convicted felon. The conviction for Tyrone Baker's murder was based on a theory of premeditation and deliberation. The conviction for Demetrius Greene's murder was based upon (1) a theory of premeditation and deliberation under the doctrine of transferred intent; and (2) the felony murder rule, with the Baker murder serving as the underlying felony. In each case, the jury found the same five statutory aggravating circumstances: (1) defendant had been previously convicted of a capital felony, N.C.G.S. § 15A-2000(e)(2); (2) defendant had been previously convicted of second-degree kidnapping, N.C.G.S. § 15A-2000(e)(3); (3) defendant had been previously convicted of armed robbery, N.C.G.S. § 15A-2000(e)(3); (4) defendant had been previously convicted of first-degree burglary, N.C.G.S. § 15A-2000(e)(3); and (5) the murder was part of a course of conduct that included the commission of other crimes of violence against other people, N.C.G.S. § 15A-2000(e)(11). The first four aggravating circumstances in each case were supported by defendant's various convictions in connec-

tion with the Brunson murder. The fifth circumstance in each case was supported by the evidence of defendant's involvement in the Richardson and Tyson shootings.

The trial court submitted to the jury four statutory mitigating circumstances as to each murder, including the catchall mitigating circumstance, N.C.G.S. § 15A-2000(f)(9). The jury found that only one statutory mitigating circumstance existed as to each murder: defendant acted under duress. N.C.G.S. § 15A-2000(f)(5) (2001). Of the thirteen nonstatutory mitigating circumstances which were submitted to the jury as to each murder, one or more jurors found that eleven circumstances existed and had mitigating value.

After thoroughly examining the record, transcript, and briefs in this case, we conclude the evidence fully supports the aggravating circumstances found by the jury. Moreover, we find no indication that the death sentences were imposed under the influence of passion, prejudice, or any other arbitrary consideration. Defendant does not contend otherwise.

[8] Defendant does contend, however, that the sentence imposed upon him is excessive and disproportionate. Accordingly, and in light of N.C.G.S. § 15A-2000(d)(2), we turn to our statutorily imposed duty of proportionality review. The purpose of our proportionality review " 'is to eliminate the possibility that a person will be sentenced to die by the action of an aberrant jury.' " *State v. Atkins*, 349 N.C. 62, 114, 505 S.E.2d 97, 129 (1998) (quoting *State v. Holden*, 321 N.C. 125, 164-65, 362 S.E.2d 513, 537 (1987), *cert. denied*, 486 U.S. 1061, 100 L. Ed. 2d 935 (1988)), *cert. denied*, 526 U.S. 1147, 143 L. Ed. 2d 1036 (1999). In conducting our proportionality review, we compare the present case with other cases in which this Court has concluded that the death penalty was disproportionate. *State v. McCollum*, 334 N.C. 208, 240, 433 S.E.2d 144, 162 (1993), *cert. denied*, 512 U.S. 1254, 129 L. Ed. 2d 895 (1994).

We have found the death penalty disproportionate in eight cases. *State v. Kemmerlin*, 356 N.C. 446, 573 S.E.2d 870 (2002); *Benson*, 323 N.C. 318, 372 S.E.2d 517; *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Rogers*, 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled on other grounds by State v. Gaines*, 345 N.C. 647, 483 S.E.2d 396, *cert. denied*, 522 U.S. 900, 139 L. Ed. 2d 177 (1997), *and by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988); *State v. Young*, 312 N.C. 669, 325 S.E.2d 181 (1985); *State v. Hill*,

311 N.C. 465, 319 S.E.2d 163 (1984); *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d 170 (1983); *State v. Jackson*, 309 N.C. 26, 305 S.E.2d 703 (1983). After careful review, we conclude that the present case is not substantially similar to any case in which this Court has found the death penalty disproportionate.

There are a number of distinctions between the present case and the disproportionate cases. First, defendant was convicted of first-degree murder on the basis of premeditation and deliberation. This indicates "a more calculated and cold-blooded crime." *Lee*, 335 N.C. at 297, 439 S.E.2d at 575. The evidence strongly supported a finding of premeditated and deliberate murder. Here, defendant had been warned Baker was looking for him and had armed himself in anticipation of "doing what [he] had to do" if confronted. Defendant had been involved in a similar confrontation just a few days prior, and had shot and wounded Keith Lamont Richardson. Defendant had thus demonstrated a willingness and ability to shoot to kill at the slightest provocation. Further, defendant testified that during the instant shootings, Baker had immediately started running after defendant fired the first shot. Despite the fact that Baker was obviously in flight, defendant chased Baker some distance down the street, firing at him repeatedly and continuously until Baker collapsed.

Second, defendant was found guilty of two counts of first-degree murder. This Court has never found a death sentence disproportionate in a case where the defendant has been convicted of multiple murders. *State v. Goode*, 341 N.C. 513, 552, 461 S.E.2d 631, 654 (1995). The fact that defendant was convicted of the murder of Demetrius Greene on the basis of transferred intent does not change this analysis. "This Court has affirmed the death penalty in several cases involving death or serious injury to one or more persons other than the murder victim." *State v. McHone*, 334 N.C. 627, 648, 435 S.E.2d 296, 308 (1993), *cert. denied*, 511 U.S. 1046, 128 L. Ed. 2d 220 (1994). Defendant fired repeatedly and recklessly at his intended victim while he was running down a busy residential city street crowded with innocent people. Defendant's actions demonstrate an egregious and callous disregard for the sanctity of life and the safety of others. Only fate prevented defendant from being charged and convicted of several more murders.

Third, this Court has also never found a death sentence disproportionate where the defendant has been convicted of a prior violent felony. *State v. Jones*, 342 N.C. 457, 481, 466 S.E.2d 696, 708, *cert. denied*, 518 U.S. 1010, 135 L. Ed. 2d 1058 (1996). "A jury could well be

more willing to impose the death sentence on one who is prone to violence." *Id.*

Fourth, the jury found the existence of the course of conduct aggravating circumstance in connection with each murder. This Court has held that the course of conduct circumstance, standing alone, is sufficient to support a death sentence. *State v. Bacon,* 337 N.C. 66, 110 n.8, 446 S.E.2d 542, 566 n.8 (1994), *cert. denied,* 513 U.S. 1159, 130 L. Ed. 2d 1083 (1995). The evidence clearly shows that defendant's violent behavior on 16 February 1997 was not an isolated incident, but was indicative of a dangerous pattern of violence.

Fifth, and finally, the jury expressly refused to find two circumstances this Court has found key to a finding of disproportionality. Although the trial court submitted them, the jury refused to find either of the statutory mitigating circumstances described under N.C.G.S. § 15A-2000(f)(2) (murder committed while under the influence of a mental or emotional disturbance) and 15A-2000(f)(7) (defendant's age at the time of the crime). This Court has relied on similar types of considerations in the past when ruling a death sentence disproportionate. *Stokes,* 319 N.C. at 21, 352 S.E.2d at 664 (age and impaired mental incapacity); *see also Bondurant,* 309 N.C. at 693-94, 309 S.E.2d at 182 (severe inebriation).

We also compare the present case with cases in which this Court has found the death penalty proportionate. *See McCollum,* 334 N.C. at 240, 244, 433 S.E.2d at 162, 164. Although this Court considers all the cases in the pool of similar cases when engaging in proportionality review, "we will not undertake to discuss or cite all of those cases each time we carry out that duty." *State v. Gregory,* 348 N.C. 203, 213, 499 S.E.2d 753, 760, *cert. denied,* 525 U.S. 952, 142 L. Ed. 2d 315 (1998). Here, for the reasons discussed above, we find this case more similar to cases in which we have found a sentence of death proportionate than to those in which we have found a sentence of death disproportionate. *See McCollum,* 334 N.C. at 244, 433 S.E.2d at 164.

"Whether a sentence of death is 'disproportionate in a particular case ultimately rest[s] upon the "experienced judgments" of the members of this Court.' " *State v. Carroll,* 356 N.C. 526, 555, 573 S.E.2d 899, 918 (2002) (quoting *State v. Green,* 336 N.C. 142, 198, 443 S.E.2d 14, 47, *cert. denied,* 513 U.S. 1046, 130 L. Ed. 2d 547 (1994)), *cert. denied,* —— U.S. ——, 156 L. Ed. 2d 640 (2003). Based upon the characteristics of this defendant and the crimes he committed, we

are convinced that the death sentences recommended by the jury and ordered by the trial court in the instant case are not disproportionate.

Defendant received a fair trial and capital sentencing proceeding free from prejudicial error. Accordingly, the judgments of the trial court sentencing defendant to death must be left undisturbed.

NO ERROR.