STATE OF NORTH CAROLINA
v.
CHAD EVRIST HERNDON
No. COA05-724
North Carolina Court of Appeals
Filed February 21, 2006
This case not for publication
Robeson County No. 01 CRS 054284.
Attorney General Roy Cooper, by Special Deputy Attorney General Karen E. Long, for the State.
Appellate Defender Staples Hughes, by Assistant Appellate Defender Anne M. Gomez, for defendant-appellant.
TYSON, Judge.
Defendant appeals from the trial court's judgment entered after a jury found him to be guilty of voluntary manslaughter. We find no error.

I. Background
In late July 2001, defendant's girlfried, Sherri Dail ("Dail") told defendant she was having an affair with Darren Locklear ("the victim"), a married man. Defendant called the victim's wife, Yolanda Locklear, who told defendant she was also aware of her husband's affair with Dail.
In the early morning hours of 3 September 2001, Michael Shane Herndon ("defendant's brother") was present at a party at the home of Shmora Locklear ("Shmora"). The victim also attended the party and was sitting at a table with a gun by his feet. Conflicting evidence was presented to show the victim had blocked defendant's brother's car and prevented him from leaving the party. Defendant's brother telephoned defendant, who drove to the party. Conflicting evidence was also presented at trial regarding whether defendant was armed. Shmora testified defendant exited his vehicle with two guns and gave one gun to defendant's brother, but did not bring a gun into her residence. India Lowery, was present at Shmora's residence, and testified defendant exited the vehicle with a gun.
Defendant's brother testified he never saw defendant with a gun. Defendant testified he had a gun in his vehicle but never took it out. Guests at the party prevented a confrontation between defendant and the victim. Defendant and his brother left Shmora's residence.
Defendant testified he received a threatening telephone call at his home from the victim later that morning. Defendant and Dail then drove to Fayetteville to purchase birthday party supplies for their two year-old child. While en route, defendant's brother telephoned defendant and told him the victim had called again and said "he was on his way over and he was going to shoot the house up and kill everybody back there." Defendant turned around, returned to his residence to pick up his brother, and drove towards Pembroke. Defendant's brother had informed defendant that the victim had called from a Pembroke phone number. Defendant testified "that means he was halfway from his house to mine. And he was actually coming over."
Three witnesses testified to the events that occurred next: defendant, defendant's brother, and Shane Hunt ("Hunt"), who was a passenger in the victim's vehicle that morning. As defendant drove towards Pembroke on Union Chapel Road, he saw a white Ford Expedition belonging to the victim driving towards him. Defendant drove into a vacant parking lot. The victim then drove his vehicle off of the highway and parked in front of defendant's vehicle. Both defendant and the victim exited their vehicles. Defendant was unarmed.
Defendant and defendant's brother testified that the victim pointed a gun at defendant's face, pulled the trigger and the gun misfired. Hunt testified the victim did not point the gun at defendant. Lumberton police officer Lewis Wood ard testified he found a spent casing in the chamber of the victim's gun. The evidence is undisputed that the victim struck defendant on the head with the gun. Defendant returned to his vehicle after being struck with the gun, and defendant and his brother testified that the victim was pulling the slide of his gun. Defendant entered his vehicle to leave the scene.
Defendant's and his brother's testimonies conflict with Hunt's testimony regarding the shooting. Hunt testified the victim said something similar to "I knew you wasn't going to do nothing." Hunt also testified the victim turned around to return to his vehicle and defendant began shooting at the victim from the window of defendant's vehicle.
Defendant and his brother testified that after defendant entered his vehicle, defendant's brother saw the victim walking towards defendant's vehicle and raise his gun. Defendant's brother told defendant "He's getting ready to shoot." Defendant testified he grabbed his gun and saw the victim coming towards his vehicle pointing a gun at him. At that point, defendant "just started shooting" at the victim from the window of his vehicle. Defendant testified he did not know where he hit the victim and did not see the victim after he stopped shooting. As defendant left the scene, he testified that Hunt emerged from the victim's vehicle holding a gun.
Defendant stopped a black truck driving in the opposite direction. The truck was driven by Andy Scott ("Scott"). Defendant told Scott that "he had just shot a boy and wanted [him] to call the ambulance." Defendant returned to his vehicle and told Dail to call the police and inform them that they were going to the police station. Dail did not testify at trial.
Pembroke police officer John Veneziano ("Officer Veneziano") was off-duty and driving down Union Chapel Road when he observed a white sport utility vehicle parked on the side of the road with a male lying on the ground on the driver's side. Officer Veneziano observed a gun located about five inches from the victim's right hand and a pool of blood gathering around his mid-section. Deputy Hubert Brian Graham ("Deputy Graham") of the Robeson County Sheriff's Department was dispatched to the scene of the shooting. While Deputy Graham was en route to the scene in a marked patrol car, he noticed defendant's vehicle pass by him while flashing his lights. Deputy Graham turned his vehicle around and defendant's vehicle came to a stop. Defendant told Deputy Graham that he "shot the person in Union Chapel." Deputy Graham put defendant in the back of his patrol car and removed two firearms from defendant's vehicle. Deputy Graham was informed by his first sergeant to turn defendant over to Pembroke police officers and proceed to the scene. Deputy Graham arrived on the scene shortly after the ambulance. Deputy Graham testified the victim was alive upon his arrival and that he heard the victim speak to EMS personnel.
Dr. Richard Johnson ("Dr. Johnson") appeared as a witness for the State as an expert pathologist and testified the autopsy he performed revealed five gunshot wounds on the victim's body. Dr. Johnson testified that defendant received three of the shots to the back, one shot to the upper left buttocks, and one shot to the front of the right leg.
Defendant was indicted by a grand jury for first-degree murder. Defendant was initially tried in March 2003 in the Robeson County Superior Court. The trial court declared a mistrial on 11 March 2003 when the jury announced their inability to reach a unanimous verdict. Defendant was retried in August 2004 in the Robeson County Superior Court. The jury found defendant to beguilty of voluntary manslaughter. The trial court sentenced defendant to a minimum term of 57 months and a maximum term of 78 months imprisonment. Defendant appeals.

II. Issues
Defendant argues: (1) the State's cross-examination and closing argument violated defendant's right to remain silent; (2) insufficient evidence was presented to support the voluntary manslaughter verdict; and (3) the trial court erred in giving the jury an aggressor instruction because another jury previously determined defendant was not the aggressor.

III. Defendant's Right to Remain Silent
Defendant argues a new trial is required because error in the State's cross-examination of defendant and closing argument violated defendant's right to remain silent. We disagree.
The following exchange occurred during cross-examination of defendant:
Q: You have had plenty of time to get this story straight with your brother, have you not?
A: It's the same thing I testified to last time.
Q: Have you had a lot of time to get your story straight with your brother?
A: If we had to get the story straight.
Defense Counsel: Object. Object.
The Court: Well, Mr. Herndon, answer the question if you can, and then you may explain your answer within the context and the boundaries of the question.
Defense Counsel: Well, I object to the form of the question, your Honor.
The Court: Overruled.
The Witness: Could you repeat your question again, sir?
Q: When was the first time that you ever told the story that you told in the last proceedings?
A: To my attorney, Angus Thompson, the next day.
Q: Not the police?
A: Excuse me?
Q: Not the police?
A: I was already charged with murder.
Q: And you didn't want to tell them that you had acted in self-defense?
A: I was already charged with murder.
Q: So you didn't want to tell them that you had acted in self-defense?
Defense Counsel: Object. Object.
The Court: Well
Defense Counsel: Object.
The Witness: I did tell
The Court: Overruled. Overruled.
The Witness: I did
The Court: Stop just a moment.
Defense Counsel: Your Honor, may I be heard?
The Court: No. Mr. Herndon, answer the question, if you can. If you can't answer it, say you can't answer it. And then you may explain your answer within the context of the question.
Defense Counsel: Sixth amendment, your Honor. May I be heard?
The Court: Let me see counsel up here.
Following the bench conference the State discontinued this line of questioning. The State ended its closing argument as follows:
I ask you . . . to consider . . . when you're considering the evidence, when these stories of what happened, when those came out, the timing of when they came out, and that should play a large role in you deciding what weight that you're going to give someone's testimony. Decide when it was the people said "Oh, this is what happened" because that, ladies and gentlemen, says a lot about whose telling you the truth.
A criminal defendant has a right to remain silent under the Fifth Amendment to the United States Constitution, as incorporated and binding upon the states by the Fourteenth Amendment, and under Article I, Section 23 of the North Carolina Constitution. U.S. Const. amend. V; U.S. Const. amend. XIV; N.C. Const. art. I, sec. 23. "A defendant's silence after receiving Miranda warnings cannot be used against him as evidence of guilt." State v. Best, 342 N.C. 502, 519, 467 S.E.2d 45, 55-56 (1996) (citing Doyle v. Ohio, 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240 (1976) (holding that when Miranda warnings are given, "it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial")).
The record does not show whether defendant had been provided his Miranda rights at the time of the silence referred to by the State in its cross-examination and closing argument. "The burden of demonstrating error rests upon the appealing party." State v. McGinnis, 70 N.C. App. 421, 423-24, 320 S.E.2d 297, 300 (1984). Without knowing whether and when defendant was provided his Miranda warnings, we are unable to determine whether defendant's right to remain silent was violated. State v. Washington, 141 N.C. App. 354, 374, 540 S.E.2d 388, 401 (2000) (holding the defendant failed to meet his "burden of establishing when he was given Miranda warnings and could have done so during his testimony or through cross-examination of various State witnesses."). This assignment of error is overruled.

IV. Sufficiency of the Evidence: Voluntary Manslaughter
Defendant argues the trial court erred in instructing the jury on voluntary manslaughter because the evidence supported only one of two verdicts: guilty of first-degree murder or not guilty of any crime. We disagree.
The trial court instructed the jury on first-degree murder, second degree murder, voluntary manslaughter, self-defense, and defense of others. The verdict sheet gave the jury the choice of finding defendant guilty of first-degree murder, second degree murder, voluntary manslaughter, or not guilty.
Defense counsel failed to object to the submission of the voluntary manslaughter instruction. Our review is limited to plain error. State v. Odom, 307 N.C. 655, 659, 300 S.E.2d 375, 378 (1983). "In deciding whether a defect in the jury instruction constitutes `plain error,' the appellate court must examine the entire record and determine if the instructional error had a probable impact on the jury's finding of guilt." Id. at 661, 300 S.E.2d at 378-79.
Defendant argues the submission of a voluntary manslaughter instruction to the jury had a probable impact on the jury's finding of guilt because "the submission of a lesser included offense in the absence of substantial evidence to support the lesser verdict, invites jurors to disregard their oaths and to reach verdicts by compromise." State v. Arnold, 98 N.C. App. 518, 530, 392 S.E.2d 140, 148 (1990). We disagree.
"Voluntary manslaughter is the unlawful killing of a human being without malice, premeditation or deliberation." State v. Rummage, 280 N.C. 51, 55, 185 S.E.2d 221, 224 (1971) (citations omitted).
Generally voluntary manslaughter occurs when one kills intentionally but does so in the heat of passion suddenly aroused by adequate provocation or in the exercise of self-defense where excessive force under the circumstances is employed or where the defendant is the aggressor bringing on the affray. Although a killing under these circumstances is both unlawful and intentional, the circumstances themselves are said to displace malice and to reduce the offense from murder to manslaughter.
State v. Wilkerson, 295 N.C. 559, 579, 247 S.E.2d 905, 916 (1978) (citations omitted) (emphasis supplied).
Here, defendant's own evidence tends to show the elements of imperfect self-defense. Defendant and defendant's brother testified the victim pointed a gun at defendant and attempted to fire. The victim then struck defendant on the head with the gun. After defendant retreated to his vehicle, defendant and defendant's brother testified they saw the victim walking towards defendant's vehicle and raise his gun. Defendant's brother remarked, "He's getting ready to shoot."
Dr. Johnson testified the victim received five gunshot wounds, three to the back, one to the buttocks, and one to the front of his right leg. Defendant testified he did not know where he shot the victim and did not see the victim after he shot. Substantial evidence was presented from which a rational trier of fact could find defendant employed excessive force while acting in self-defense. Id. Based upon the evidence presented, the trial court's submission of a voluntary manslaughter instruction to the jury was not error, much less plain error. See State v. Walker, 22 N.C. App. 22, 23, 205 S.E.2d 328, 329-30 (1974) (evidence sufficient to support verdict of voluntary manslaughter where victim called the defendant a "name" and reached for a gun and the defendant grabbed the gun first and shot the victim.") This assignment of error is overruled.

V. Aggressor Instruction
Defendant argues the trial court also committed plain error in giving the jury an aggressor instruction where another jury previously determined defendant was not the aggressor. We disagree.
During jury deliberations at defendant's first trial, the jury sent a note to the judge that stated, "We came to the agreement that he was not the aggressor. Chad did not go there to kill Locklear. We have 9 not guilty [and] 3 manslauter (sic) . . . ." This jury was unable to reach a unanimous verdict and the trial court declared a mistrial.
Defendant contends that, "once a jury has conclusively determined the existence or nonexistence of a fact, the state is collaterally estopped under the Double Jeopardy Clause from relitigating that same issue in a second criminal proceeding." State v. Carter, 357 N.C. 345, 355, 584 S.E.2d 792, 800 (2003) (citation omitted). In State v. Warren, our Supreme Court stated, "`Collateral estoppel' means that once an issue of ultimate fact has been determined by a valid and final judgment, that issue may not be relitigated by the same parties in a subsequent action." 313 N.C. 254, 264, 328 S.E.2d 256, 263 (1985). "Defendant has the burden of demonstrating that the issue he seeks to foreclose from relitigation was actually decided in the previous proceeding." Carter, 357 N.C. at 355-56, 584 S.E.2d at 800.
In State v. Booker, 306 N.C. 302, 293 S.E.2d 78 (1982), the foreman of the jury during defendant's first trial sent a note to the trial judge which stated that the jury was deadlocked seven to five in favor of a verdict of guilty of second-degree murder. Id. at 304, 306 S.E.2d at 79. Our Supreme Court held that the jury did not return a final verdict. Id. at 307, 293 S.E.2d at 81; see also N.C. Gen. Stat. § 15A-1237(a) ("The verdict must be in writing, signed by the foreman, and made a part of the record of the case."); See also State v. Mays, 158 N.C. App. 563, 575-76, 582 S.E.2d 360, 368 (2003) (A jury's note in the first trial stating"we can unanimously agree that minimally the defendant is guilty of 2nd degree murder" was not binding on the second trial.)
Here, the doctrine of collateral estoppel does not apply. No final determination was reached by the jury whether or not defendant was the aggressor. The note from the prior jury demonstrated a moment in time during the jury deliberations and was not a final verdict. This assignment of error is overruled.

VI. Conclusion
Defendant failed to show the State's cross-examination and closing argument improperly commented upon and violated his right to remain silent under the Fifth Amendment. Sufficient evidence was presented to support the jury instruction on voluntary manslaughter. The trial court did not commit plain error in submitting an aggressor instruction to the jury to warrant a new trial. Defendant received a fair trial free from prejudicial or plain errors he assigned and argued.
No error.
Judges HUDSON and GEER concur.
Report per Rule 30(e).