STATE OF NORTH CAROLINA v. CHAD EVRIST HERNDON

No. COA05-724

(Filed 2 May 2006)

## 1. Evidence— cross-examination—right to remain silent

The prosecution was not improperly permitted to cross-examine defendant in a voluntary manslaughter case even though defendant contends it violated his right to remain silent, because: (1) assuming defendant's objection properly preserved for review a challenge to the pertinent questions and answers, it is not apparent that the State was commenting on post-Miranda silence when the testimony is reviewed in context; (2) if the questioning related to defendant's conversation with a deputy on the day of the shooting, post-Miranda silence was not implicated; and (3) defense counsel failed to object to the initial questions and any later objection regarding the State's initial questions was not preserved for appellate review.

## 2. Criminal Law— prosecutor's argument—defendant's right to remain silent

The trial court did not err in a voluntary manslaughter case by failing to intervene ex mero motu during certain portions of the State's closing argument where defendant contends the State improperly referred to defendant's exercise of the right to remain silent and asked the jury to discount defendant's testimony, because: (1) contrary to defendant's assertion, the State was referring to the testimony of his brother and his girlfriend's failure to support defendant's version of the facts; (2) taken in context, the pertinent portion of the closing argument does not necessarily refer to any post-Miranda silence by defendant, but to the refusal of some eyewitnesses and the willingness of another to give statements to the investigators on the day of the shooting; and (3) the other pertinent portion of the closing argument was supported by the cross-examination of defendant's brother, the direct examination of the investigating detective, and the earlier argument regarding defendant's brother and his girlfriend.

## 3. Homicide— instruction—voluntary manslaughter

The trial court did not commit plain error by instructing the jury on voluntary manslaughter in addition to first-degree murder, second-degree murder, self-defense, and defense of others, be-

cause: (1) defendant's own evidence tends to show the elements of imperfect self-defense; and (2) substantial evidence was presented from which a rational trier of fact could find defendant employed excessive force in shooting the victim five times with three shots striking the victim in the back and buttocks while acting in self-defense.

**4. Criminal Law— instruction—aggressor—collateral estoppel—double jeopardy**

The trial court did not commit plain error in a voluntary manslaughter case by giving the jury an aggressor instruction where an earlier jury in defendant's first trial allegedly previously determined he was not the aggressor, because: (1) the doctrine of collateral estoppel did not apply, nor did jeopardy attach, when no unanimous verdict was reached by the earlier jury about whether defendant was the aggressor; and (2) the note from the prior jury stating it had determined that defendant was not the aggressor merely demonstrated a moment in time during the jury deliberations.

Appeal by defendant from judgment entered 23 August 2004 by Judge Robert F. Floyd, Jr., in Robeson County Superior Court. Heard in the Court of Appeals 26 January 2006.

*Attorney General Roy Cooper, by Special Deputy Attorney General Karen E. Long, for the State.*

*Appellate Defender Staples Hughes, by Assistant Appellate Defender Anne M. Gomez, for defendant-appellant.*

TYSON, Judge.

Chad Evrist Herndon ("defendant") appeals from judgment entered after a jury found him to be guilty of voluntary manslaughter. We find no error.

## I. Background

In late July 2001, defendant's girlfriend, Sherri Dail ("Dail") told defendant she was having an affair with Darren Locklear ("the victim"), a married man. Defendant called the victim's wife, Yolanda Locklear, who told him she was also aware of her husband's affair with Dail.

In the early morning hours of 3 September 2001, Michael Shane Herndon ("defendant's brother") was present at a party at the home of Shmora Locklear ("Shmora"). The victim also attended the party and was sitting at a table with a gun by his feet. Conflicting evidence was presented to show the victim had blocked defendant's brother's car and prevented him from leaving the party. Defendant's brother telephoned defendant, who drove to the party.

Conflicting evidence was also presented at trial regarding whether defendant was armed. Shmora testified defendant exited his vehicle with two guns and gave one gun to defendant's brother, but did not bring a gun into her residence. India Lowery, was present at Shmora's residence, and testified defendant exited the vehicle with a gun.

Defendant's brother testified he never saw defendant with a gun. Defendant testified a gun was present in his vehicle, but he did not remove it. Guests at the party intervened and prevented a confrontation between defendant and the victim. Defendant and his brother left Shmora's residence. Defendant testified he received a threatening telephone call at his home from the victim later that morning.

Defendant and Dail left and drove toward Fayetteville to purchase birthday party supplies for their two-year-old child. While en route, defendant's brother telephoned defendant and told him the victim had called again and said "he was on his way over and he was going to shoot the house up and kill everybody back there." Defendant's brother informed defendant that the victim had called from a Pembroke telephone number. Defendant turned around his vehicle, returned to his residence, picked up his brother, and drove toward Pembroke. Defendant testified "that means he was halfway from his house to mine. And he was actually coming over."

Three witnesses testified to the events that occurred next: defendant, defendant's brother, and Shane Hunt ("Hunt"), who was a passenger in the victim's vehicle that morning. As defendant drove towards Pembroke on Union Chapel Road, he saw a white Ford Expedition belonging to the victim driving toward him. Defendant drove into a vacant parking lot. The victim drove his vehicle off of the highway and parked in front of defendant's vehicle. Both defendant and the victim exited their vehicles. Defendant was unarmed.

Defendant and defendant's brother testified that the victim pointed a gun at defendant's face and pulled the trigger, but the gun

misfired. Hunt testified the victim did not point the gun at defendant. Lumberton police officer Lewis Woodard testified he found a spent casing in the chamber of the victim's gun. Undisputed evidence shows the victim struck defendant on his head with the gun. Defendant returned to his vehicle after being struck by the victim's gun. Defendant and his brother testified they saw the victim pulling the slide of his gun. Defendant entered his vehicle to leave the scene.

Defendant and his brother's testimonies conflict with Hunt's testimony regarding the shooting. Hunt testified the victim said something similar to "I knew you wasn't going to do nothing." Hunt also testified the victim turned around to return to his vehicle and defendant began shooting at the victim from the window of defendant's vehicle.

Defendant and his brother testified that after defendant entered his vehicle, defendant's brother saw the victim walking towards defendant's vehicle and raise his gun. Defendant's brother told defendant, "He's getting ready to shoot." Defendant testified he grabbed his gun and observed the victim coming towards his vehicle and pointing a gun at him. At that point, defendant "just started shooting" at the victim from the window of his vehicle. Defendant testified he did not know where he hit the victim and did not see the victim after he stopped shooting. As defendant left the scene, Hunt emerged from the victim's vehicle holding a gun.

Defendant stopped a black truck driving in the opposite direction. The truck was driven by Andy Scott ("Scott"). Defendant told Scott that "he had just shot a boy and wanted [him] to call the ambulance." Defendant returned to his vehicle and told his girlfriend, Dail, to call the police and inform them that he was en route to the police station. Dail did not testify at trial.

Pembroke Police Officer John Veneziano ("Officer Veneziano") was off duty and driving down Union Chapel Road when he observed a white sport utility vehicle parked on the side of the road with a male lying on the ground on the driver's side. Officer Veneziano observed a gun located about five inches from the victim's right hand and a pool of blood gathering around his mid-section.

Robeson County Sheriff's Deputy Hubert Brian Graham ("Deputy Graham") testified he was dispatched to the scene of the shooting. While Deputy Graham was en route to the scene in a marked patrol car, he noticed defendant's vehicle pass him with flashing lights.

Deputy Graham turned his vehicle around and defendant's vehicle came to a stop. Defendant told Deputy Graham that he "shot the person in Union Chapel." Deputy Graham put defendant into the back of his patrol car and removed two firearms from defendant's vehicle. Deputy Graham's First Sergeant told him to turn defendant over to Pembroke police officers and proceed to the scene. Deputy Graham arrived on the scene shortly after the ambulance. Deputy Graham testified the victim was alive upon his arrival and that he heard the victim speak to EMS personnel.

Dr. Richard Johnson ("Dr. Johnson") appeared as a witness for the State as an expert pathologist and testified that the autopsy he performed revealed five gunshot wounds on the victim's body. The victim received three shots to the back, one shot to the upper left buttocks, and one shot to the front of the right leg.

Defendant was charged, and later indicted by a grand jury, for first-degree murder. Defendant was initially tried in March 2003 in Robeson County Superior Court. The trial court declared a mistrial on 11 March 2003 after the jury announced their inability to reach a unanimous verdict. Defendant was retried in August 2004 in Robeson County Superior Court. The jury found defendant to be guilty of voluntary manslaughter. The trial court sentenced defendant to a minimum term of fifty-seven months and a maximum term of seventy-eight months imprisonment. Defendant appeals.

## II. Issues

Defendant argues: (1) the State's cross-examination and closing argument violated his right to remain silent; (2) insufficient evidence was presented to support the voluntary manslaughter verdict; and (3) the trial court erred in giving the jury an aggressor instruction after an earlier jury had determined him not to be the aggressor.

## III. Defendant's Right to Remain Silent

Defendant argues a new trial is required because the State's cross-examination of him and its closing argument violated his right to remain silent. We disagree.

A criminal defendant has a right to remain silent under the Fifth Amendment to the United States Constitution, as incorporated and binding upon the states by the Fourteenth Amendment, and under Article I, Section 23 of the North Carolina Constitution. U.S. Const. amend. V; U.S. Const. amend. XIV; N.C. Const. art. I, sec. 23. "A

defendant's silence after receiving *Miranda* warnings cannot be used against him as evidence of guilt." *State v. Best,* 342 N.C. 502, 519, 467 S.E.2d 45, 55-56 (1996) (citing *Doyle v. Ohio,* 426 U.S. 610, 49 L. Ed. 2d 91 (1976) (holding that when *Miranda* warnings are given, "it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial.")).

## A. Cross-Examination

[1] Defendant asserts the State improperly questioned him about invoking his right to silence. The transcript shows the following exchange occurred during the State's cross-examination of defendant:

Q: You have had plenty of time to get this story straight with your brother, have you not?

A: It's the same thing I testified to last time.

Q: Have you had a lot of time to get your story straight with your brother?

A: If we had to get the story straight.

DEFENSE COUNSEL: Object. Object.

THE COURT: Well, Mr. Herndon, answer the question if you can, and then you may explain your answer within the context and the boundaries of the question.

DEFENSE COUNSEL: Well, I object to the form of the question, your Honor.

THE COURT: Overruled.

THE WITNESS: Could you repeat your question again, sir?

Q: When was the first time that you ever told the story that you told in the last proceedings?

A: To my attorney, Angus Thompson, the next day.

Q: Not the police?

A: Excuse me?

Q: Not the police?

A: I was already charged with murder.

Q: So you didn't want to tell them that you had acted in self-defense?

A: I was already charged with murder.

When the State repeated the last question, defense counsel objected. After the trial court overruled defendant's objection, defense counsel requested a bench conference at which he argued that the question violated defendant's Fifth and Sixth Amendment rights. During the course of the bench conference, the prosecutor withdrew his question.

Presuming defendant's objection properly preserved for review a challenge to the prior questions and answers, it is not apparent that the State was commenting on post-*Miranda* silence when the testimony is reviewed in context. Defendant testified on direct examination he told Officer Graham prior to being taken into custody someone had tried to kill him and that he had to shoot. On cross-examination, the State pointed out that Officer Graham had testified that defendant had never mentioned anyone was trying to kill him. The State asked why Deputy Graham would lie on the stand. Defendant claimed that Graham was lying at the request of a third party. In following up on this contention, the State then asked "[w]hen was the first time that you ever told the story that you told in the last proceedings," referring to the claim of self-defense. Defendant did not claim he had first asserted self defense to Deputy Graham, but rather testified he had first told "the story" to his attorney the day after the shooting. As his counsel was objecting, defendant apparently realized what question was being asked and attempted to testify, first "I did tell," and then again, "I did."

Defendant has failed to show any error occurred. If the questioning related to defendant's conversation with Deputy Graham on the day of the shooting, post-*Miranda* silence was not implicated. Defense counsel failed to object to the initial questions and any later objection regarding the State's initial questions was not preserved for appellate review. Regarding the final question asked by the State since that question was withdrawn and defendant made no further objections or motions to these questions, there is no error to review. This assignment of error is dismissed.

### B. Closing Argument

[2] Defendant argues the trial court erred by failing to intervene during certain portions of the State's closing argument *ex mero motu*.

**STATE v. HERNDON**

[177 N.C. App. 353 (2006)]

Defendant asserts the State improperly referred "to [defendant's] exercise of the right to remain silent" and was "asking the jury to discount [defendant's] testimony." Our review of the transcript does not support this assertion. To the contrary, the State was plainly referring to defendant's brother's, testimony and defendant's girlfriend's failure to support defendant's version of the facts.

The State stressed in its cross-examination of defendant's brother that he did not tell the police that defendant had acted in self-defense:

Q. Did you ever tell the police officers the story that you've told in here today?

A. No, sir, nobody never asked me either.

Q. Your brother was in jail after he was charged, is that right?

A. Yes, sir.

Q. Was it because that you had to have time in order to get your story straight and that's the reason that you told no police officer within that 30 days or any time thereafter the story that you've told in here today?

A. It was just nobody never asked, sir.

. . . .

Q. But you were asked, sir, to tell us what you saw.

A. You asked me, sir, if I wanted to say anything.

Q. And you said no.

A. I said no, sir.

Q. That was your opportunity. Someone did ask you to tell what you saw.

A. Well—

Q. And you refused?

A. There was another opportunity, too, sir.

The State later called the detective in charge of the investigation who testified that he went to see Michael Shane Herndon and defendant's girlfriend and unsuccessfully attempted to obtain a statement from either of them on the day of defendant's arrest.

During its closing argument, the State first pointed out that defendant's girlfriend, Dail, "was an eye witness to this killing; and yet, [she] hasn't said a word. . . . Why is that?" Then, the State argued:

> Prior to testifying, Michael Shane Herndon says not one word to the police about self-defense. Why not? Do you really think that if they thought this was a self-defense case, you couldn't have shut them up. They'd been down at the police station, "I want to give a statement, I want to give a statement." But they didn't do it. They didn't say, "Hey, look, you know, my brother's not guilty, or "My boyfriend's not guilty. It was self-defense." When was it that Shane Hunt gave his statement telling what he saw? The very day. That afternoon. Because he didn't have to have time to make up a defense or make up evidence.

Defendant's challenge to the State's closing argument immediately follows this commentary on defendant's brother's and Dail's failure to tell the police that defendant acted in self-defense:

> Now, the defendant gets the evidence that the State has. Have to give them everything we've got. He waits and tailors his testimony to what the evidence is. And it comes down to whether you believe Shane Hunt, or whether you now believe the defendant.

In context, this portion of the closing argument does not necessarily refer to any post-*Miranda* silence by defendant, but to the refusal of some eyewitnesses and the willingness of another to give statements to the investigators on the day of the shooting.

The subsequent portion challenged by defendant the State asked the jury to:

> consider, when you're considering that evidence, when these stories of what happened, when those came out, the timing of when they came out, and that should play a large role in you deciding what weight that you're going to give someone's testimony. Decide when it was the people said "Oh, this is what happened" because that, ladies and gentlemen, says a lot about who's telling you the truth.

This closing argument is supported by the cross-examination of defendant's brother, the direct examination of the investigating detective, and the earlier argument regarding defendant's brother and Dail. In the context of the closing arguments, these statements do not necessarily refer to defendant's post-*Miranda* silence. The trial court did

not err in failing to intervene in the closing argument *ex mero motu.* This assignment of error is overruled.

## IV. Sufficiency of the Evidence: Voluntary Manslaughter

**[3]** Defendant argues the trial court erred in instructing the jury on voluntary manslaughter because the evidence supported only one of two verdicts: guilty of first-degree murder or not guilty of any crime. We disagree.

The trial court instructed the jury on first-degree murder, second degree murder, voluntary manslaughter, self-defense, and defense of others. The verdict sheet gave the jury the choice of finding defendant guilty of first-degree murder, second degree murder, voluntary manslaughter, or not guilty.

Defense counsel failed to object to the submission of the voluntary manslaughter instruction. Our review is limited to plain error. *State v. Odom,* 307 N.C. 655, 659, 300 S.E.2d 375, 378 (1983). "In deciding whether a defect in the jury instruction constitutes 'plain error,' the appellate court must examine the entire record and determine if the instructional error had a probable impact on the jury's finding of guilt." *Id.* at 661, 300 S.E.2d at 378-79.

Defendant argues the submission of a voluntary manslaughter instruction to the jury had a probable impact on the jury's finding of guilt because "the submission of a lesser included offense in the absence of substantial evidence to support the lesser verdict, invites jurors to disregard their oaths and to reach verdicts by compromise." *State v. Arnold,* 98 N.C. App. 518, 530, 392 S.E.2d 140, 148 (1990). We disagree.

"Voluntary manslaughter is the unlawful killing of a human being without malice, premeditation or deliberation." *State v. Rummage,* 280 N.C. 51, 55, 185 S.E.2d 221, 224 (1971) (citations omitted).

> Generally voluntary manslaughter occurs when one kills intentionally but does so in the heat of passion suddenly aroused by adequate provocation *or in the exercise of self-defense where excessive force under the circumstances is employed* or where the defendant is the aggressor bringing on the affray. Although a killing under these circumstances is both unlawful and intentional, the circumstances themselves are said to displace malice and to reduce the offense from murder to manslaughter.

*State v. Wilkerson,* 295 N.C. 559, 579, 247 S.E.2d 905, 916 (1978) (emphasis supplied) (citations omitted).

Here, defendant's own evidence tends to show the elements of imperfect self-defense. Defendant and defendant's brother testified the victim pointed a gun at defendant and attempted to fire. The victim then struck defendant on the head with the gun. After defendant retreated to his vehicle, defendant and defendant's brother testified the victim walked towards defendant's vehicle and raised his gun. Defendant's brother remarked, "He's getting ready to shoot."

Dr. Johnson testified the victim received five gunshot wounds, three to the back, one to the buttocks, and one to the front of his right leg. Defendant testified he did not know where he shot the victim and did not see the victim after he shot. Substantial evidence was presented from which a rational trier of fact could find defendant employed excessive force in shooting the victim five times with three shots striking the victim in the back and buttocks while acting in self-defense. *Id.*

Based upon the evidence presented, the trial court's submission of a voluntary manslaughter instruction to the jury was not plain or prejudicial error. *See State v. Walker,* 22 N.C. App. 22, 23, 205 S.E.2d 328, 329-30 (1974) (evidence sufficient to support a verdict of voluntary manslaughter where the victim called the defendant a "name" and reached for a gun and the defendant grabbed the gun first and shot the victim). This assignment of error is overruled.

### V.  Aggressor Instruction

[4] Defendant argues the trial court also committed plain error in giving the jury an aggressor instruction where an earlier jury previously determined defendant not to be the aggressor. We disagree.

During jury deliberations at defendant's first trial, the jury sent a note to the judge that stated, "We came to the agreement that he was not the aggressor. Chad did not go there to kill Locklear. We have 9 not guilty [and] 3 manslauter (sic) . . . ." The jury at defendant's first trial failed to reach a unanimous verdict and the trial court declared a mistrial.

Defendant contends that, "once a jury has conclusively determined the existence or nonexistence of a fact, the [S]tate is collaterally estopped under the Double Jeopardy Clause from relitigating that same issue in a second criminal proceeding." *State v. Carter,* 357 N.C.

**STATE v. HERNDON**

[177 N.C. App. 353 (2006)]

345, 355, 584 S.E.2d 792, 800 (2003) (citation omitted). In *State v. Warren,* our Supreme Court stated, " 'Collateral estoppel' means that once an issue of ultimate fact has been determined by a *valid and final judgment,* that issue may not be relitigated by the same parties in a subsequent action." 313 N.C. 254, 264, 328 S.E.2d 256, 263 (1985). "Defendant has the burden of demonstrating that the issue he seeks to foreclose from relitigation was actually decided in the previous proceeding." *Carter,* 357 N.C. at 355-56, 584 S.E.2d at 800.

In *State v. Booker,* the foreman of the jury during the defendant's first trial sent a note to the trial judge which stated that the jury was deadlocked seven to five in favor of a verdict of guilty of second degree murder. 306 N.C. 302, 304, 293 S.E.2d 78, 79 (1982). Our Supreme Court held that the jury did not return a final verdict. *Id.* at 307, 293 S.E.2d at 81; *see* N.C. Gen. Stat. § 15A-1237(a) ("The verdict must be in writing, signed by the foreman, and made a part of the record of the case."); *see also State v. Mays,* 158 N.C. App. 563, 575-76, 582 S.E.2d 360, 368 (2003) (A jury's note in the first trial stating "we can unanimously agree that *minimally* the defendant is guilty of 2nd degree murder" was not binding on the second trial.)

Here, the doctrine of collateral estoppel does not apply. No unanimous verdict was reached by the jury whether or not defendant was the aggressor. *Id.* The note from the prior jury demonstrated a moment in time during the jury deliberations and was not a final verdict for collateral estoppel to apply or jeopardy to attach. This assignment of error is overruled.

## VI. Conclusion

Defendant failed to show the State's cross-examination and closing argument improperly commented upon and violated his right to remain silent under the Fifth Amendment. Defendant failed to show the State's cross-examination and closing argument violated his right to remain silent.

Sufficient evidence was presented to support the jury instruction on voluntary manslaughter. The trial court did not commit plain error in submitting voluntary manslaughter or an aggressor instruction to the jury to warrant a new trial. Defendant received a fair trial free from prejudicial or plain errors he assigned and argued.

NO ERROR.

Judges HUDSON and GEER concur.